UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE FEDERAL REPUBLIC OF NIGERIA; ABUBAKAR MALAMI, THE ATTORNEY GENERAL OF THE FEDERAL REPUBLIC OF NIGERIA<br><br><br><br>Applicants<br><br><br>VR ADVISORY SERVICES, LTD.; VR ADVISORY SERVICES (USA) LLC; VR CAPITAL GROUP, LTD.; VR GLOBAL ONSHORE FUND, L.P.; VR ARGENTINA RECOVERY ONSHORE FUND II, L.P.; RICHARD DIETZ; JEFFREY JOHNSON; and ASHOK RAJU<br>Respondents. | Case No.: 1:20-mc-209 |

## MEMORANDUM OF LAW
## IN SUPPORT OF APPLICANTS' 28 U.S.C. § 1782 PETITION

**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500

*Attorneys for Applicants the Federal Republic of Nigeria and the Honorable Abubakar Malami, the Attorney General of the Federation and Minister of Justice of the Federal Republic of Nigeria*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT.................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

    A.  The Gas Supply and Processing Agreement ..................................................... 4

        1.  P&ID Had No Ability or Intention To Perform The GSPA; Instead It Bribed FRN Officials To Create A Pretext For Commencing A $6.6 Billion Arbitration Against FRN ........................................................................................................ 4

        2.  The GSPA Was Not Properly Authorized Under Nigerian Law ................................. 6

    B.  Discovery of P&ID's Bribes and Fraud..................................................... 6

    C.  The Sham London Arbitration ....................................................... 9

    D.  Status of The Nigerian Proceedings......................................... 11

    E.  The Relief Applicants Seek From This Court.................................. 12

ARGUMENT ......................................................................................................................... 13

    A.  The Requested Discovery Meets The Statutory Requirements Of Section 1782(a)......... 13

    B.  The Discretionary Factors Weigh In Favor Of Issuing Discovery .................................. 17

CONCLUSION ..................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery*,
121 F.3d 77 (2d. Cir. 1997) ................................................................................................... 17

*In re Application of Chevron Corp.*,
709 F.Supp.2d 283 (S.D.N.Y. 2010) ...................................................................................... 14

*In re Application of Consellior SAS*,
2017 WL 449770 (Feb. 2, 2017, S.D.N.Y.) ...................................................................... 14, 19

*In re Dickson*,
2020 WL 550271 (Feb. 4, 2020, S.D.N.Y.) ............................................................................ 14

*In re Edelman*,
295 F.3d 171 (2d Cir. 2002) ................................................................................................... 13

*In re Euromepa S.A.*,
51 F.3d 1095 (2d Cir. 1995) .............................................................................................. 18, 19

*In re Hansainvest Hanseatische Investment-GmbH*,
364 F.Supp.2d 243 (S.D.N.Y. 2018) ...................................................................................... 19

*In re OOO Promnefstroy*,
2009 WL 3335608 (S.D.N.Y. Sep. 15, 2009) ........................................................................ 18

*In re Optimal Investment Services, S.A.*,
773 F.3d 456 (2d Cir. 2014) .............................................................................................. 15, 17

*In re Petition of Bloomfield Investment Resources Corp.*,
2018 WL 6418421 (Dec. 6, 2018, S.D.N.Y.) ......................................................................... 14

*In re Setraco Nigeria Ltd.*, No. 13-mc-32,
2013 WL 3153902 (Jun. 19, 2013, M.D. Fla.) .................................................................. 15, 18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ...................................................................................................... 16, 17, 18

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) .......................................................................... 14, 15, 16

*Young v. U.S. Dept. of Justice*,
   1988 WL 131302 (S.D.N.Y. Nov. 28, 1988) ....................................................... 16, 17

**Statutes**

28 U.S.C. § 1782 ........................................................................................................ Passim

**Rules**

Federal Rules of Civil Procedure 26 ................................................................................ 1

Federal Rules of Civil Procedure 45 ................................................................................ 1

Applicants the Federal Republic of Nigeria ( "FRN") and the Honorable Abubakar Malami, the Attorney General of the Federation and Minister of Justice of FRN ("Malami" and together with FRN, "Applicants"), by their undersigned counsel, respectfully submit this memorandum of law in support of the Applicants' request (the "Application") for an order pursuant to 28 U.S.C. §1782(a) ("Section 1782") and Rules 26 and 45 of the Federal Rules of Civil Procedure (the "Federal Rules") authorizing the Applicants to conduct discovery in this district for use in criminal investigations and judicial proceedings pending in FRN (the "Nigeria Proceedings").

## PRELIMINARY STATEMENT

This Section 1782 Application concerns a fraudulent natural gas processing agreement, the Gas Supply and Processing Agreement  ("GSPA"), procured by non-party Process & Industrial Developments Limited ("P&ID") through the  payment of bribes to former FRN officials and close business associates of these corrupt officials.  Entered into in January 2010, the twenty-year term GSPA obligated P&ID to construct and operate a gas stripping plant in FRN to process natural gas, known as "wet gas," by removing the natural gas liquids and returning to FRN lean gas suitable for use in power generation or other purposes.  P&ID, a shell entity organized in the British Virgin Islands, never had the technical capability or financial resources to perform its obligations under the GSPA, and it never had any intention to perform the GSPA.  FRN's investigations have confirmed that P&ID never did any work on the project.  The only thing P&ID engineered was a fraudulent arbitration claim against FRN to collect phantom lost profits resulting in a $6.6 billion arbitration award in 2017, which with interest is now purportedly valued near $10 billion (the "Award").  FRN's investigation has revealed that P&ID had no business except the fraudulently-obtained GSPA and Award.

-1-

Applicants have uncovered evidence of hundreds of thousands of dollars of bribe payments made by P&ID and its affiliates to officials within the FRN government who unlawfully commandeered the approval process for the GSPA, and then abdicated their responsibility by declining to scrutinize P&ID or the GSPA despite the massive exposure to their country and government.  Had any genuine due diligence been performed, and had the required governmental channels been followed, FRN would never have approved the GSPA.

In or around 2018, a twenty-five percent interest in P&ID was acquired by VR Advisory Services, Ltd. ("VR Advisory"), an entity with U.S. headquarters located within this district, and a seventy-five percent interest in P&ID was acquired by Lismore Capital, Ltd. ("Lismore Capital"), a Cayman Island entity.  *See* Declaration of Attorney General Abubakar Malami, executed on May 6, 2020 ("Malami Decl."), Ex. 2.  It is inconceivable that a sophisticated alternative asset investor like VR Advisory acquired a twenty-five percent interest in P&ID without conducting due diligence concerning P&ID as well as the origins and underlying facts concerning P&ID's sole assets, namely the GSPA and the Award.  The due diligence information collected by VR Advisory is highly relevant to FRN's ongoing investigations and prosecutions.

Accordingly, Applicants request authority to take discovery from VR Advisory, and its affiliates, VR Advisory Services (USA) LLC ("VR Advisory USA"),  VR Capital Group, Ltd. ("VR Capital"), VR Global Onshore Fund, L.P. ("VR Onshore"), VR Argentina Recovery Onshore Fund II, L.P. ("VR Argentina"), and their directors and officers Richard Dietz ("Mr. Dietz"), Jeffrey Johnson ("Mr. Johnson"), and Ashok Raju ("Mr. Raju" and collectively with VR Advisory, VR Advisory USA, VR Capital, VR Onshore, VR Argentina, Mr. Dietz, and Mr. Johnson, are "VR Respondents").  As the current beneficial owners of P&ID, VR Respondents possess information concerning P&ID's historic and current business operations, including the circumstances

surrounding the GSPA, payments made to FRN officials to procure the GSPA, and the subsequent arbitration that resulted in the Award.

Applicants bring this Application for the Court's assistance in procuring documents and information located within the Southern District of New York that will support Applicants' ongoing investigation and prosecutions in FRN.  Applicants request the Court's permission to issue subpoenas to VR Respondents to obtain discovery of: (1) documents regarding the acquisition of P&ID by VR Respondents and Lismore Capital; (2) financial records concerning P&ID, its known affiliate entities and their owners (past and current); (3) P&ID's historic and current business operations relating to the GSPA and the Award; (4) documents concerning the negotiation, execution and enforcement of the GSPA; and (5) documents concerning the procurement of and efforts to enforce the Award by P&ID.  Applicants maintain that the discovery sought herein will uncover further evidence of bribes and money laundering activity related to P&ID's scheme and corrupt FRN officials' participation in the scheme.  As explained below, the Application satisfies the statutory requirements of Section 1782(a), and all relevant discretionary factors also weigh strongly in favor of an order granting the Application.

## STATEMENT OF FACTS

Applicants are entitled to discovery from VR Respondents.  VR Advisory is the 25% owner of P&ID, and P&ID's only asset is the fraudulently-procured GSPA and arbitral award.  VR Respondents certainly conducted due diligence into both the GSPA and the arbitral award before buying 25% of P&ID.  Those due diligence materials, and all other corporate, operational, and financial records that VR Respondents maintain concerning their investment in P&ID are relevant to the Nigerian Proceedings where Applicants are investigating the GSPA and the resulting arbitral award that were obtained criminally and threaten to cripple FRN.  VR Respondents' records

relating to P&ID, including, without limitation, documents and communications between P&ID, its affiliates, and FRN officials, are likely to aid Applicants in their ongoing investigations and proceedings.  Applicants describe below the details of P&ID's fraudulent scheme known to date.[1]

### A.  The Gas Supply and Processing Agreement

During the 2009-2010 time period, FRN was in the midst of a constitutional crisis.  FRN's then president, President Umaru Musa Yar'Adua, had been absent from office due to ill-health since November 2009, and soon thereafter passed in May 2010.  *See* Malami Decl. ¶20.  The presidency remained vacant after President Yar'Adua's illness in November 2009 until  February 2010, when then Vice-President Goodluck Jonathan was appointed by FRN's senate to assume the role of President.  *Id*.  It was during this turbulent period of time, when FRN was suffering from a temporary "power vacuum," that P&ID bribed corrupt FRN government officials within FRN's Ministry of Petroleum to force through the multi-billion dollar agreement for the supply and processing of natural gas in Nigeria.  *Id*.

### 1.  P&ID Had No Ability or Intention To Perform The GSPA; Instead It Bribed FRN Officials To Create A Pretext For Commencing A $6.6 Billion Arbitration Against FRN

On January 11, 2010, while FRN was without an official acting head of state, P&ID, a BVI shell entity, and FRN (via the then corruption-plagued Ministry of Petroleum) entered into the GSPA, a twenty-year arrangement for building and operating a gas-stripping plant along the Niger Delta in Nigeria. *See* Malami Decl., ¶¶5-6,10.

---

[1] The following summary of P&ID's fraudulent scheme is offered to provide the Court with an overview of the corrupt practices P&ID and its affiliates engaged in, including bribes paid to FRN officials.  It is not an exhaustive list of the misdeeds by P&ID and its affiliates, their officers and directors or current and former Nigerian government officials.  Nor is this summary intended to be a comprehensive presentation of the substantive evidence that FRN has uncovered to date.  Applicants reserve all rights to bring additional charges in the Nigerian Proceedings.

Pursuant to the terms of the GSPA, FRN was to supply natural gas ("Wet Gas") to P&ID via a government pipeline to the site of P&ID's production facility.  *See* Malami Decl., ¶7.   In turn, P&ID committed to constructing and operating a gas stripping plant to process the Wet Gas by removing the natural gas liquids contained within it and returning to FRN lean gas suitable for use for power generation.  *Id*.   As set out in Paragraph 2 of the GSPA, the alleged objective of the GSPA was:

> [T]o provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of [natural gas or Wet Gas] by the Government and the processing of said Wet Gas by P&ID utilizing two or more process streams with a total capacity of up to 400 MMSCuFD together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this [GSPA] and its Appendices and to operate and maintain the facilities in an efficient manner.

*See* Malami Decl. at Ex. 1, Paragraph 2.

As part of the GSPA, P&ID falsely represented that it "possess[ed] the requisite finance, technology and competence for the fast track development of the project" and that it had "undertaken all necessary studies, including the identification of suitable associated gas fields," to be able to "commence fast track development of the project" in accordance with the GSPA."  *See* Malami Decl., at Ex. 1 (Recitals).  Contrary to these representations, P&ID had no apparent assets, no obvious industry experience, and no other credentials to suggest that it would be suitable to operate and carry out the type of sophisticated operation required under the GSPA.  *Id*. at ¶4.

Having secured (through bribes) the support of corrupt former officials within FRN, including Dr. Rilwanu Lukman, FRN's former Minister of Petroleum, and Taofiq Tijani, an admitted recipient of bribes from P&ID who worked for Dr. Lukman, on January 11, 2010, the GSPA was executed on behalf of the Ministry of Petroleum by Dr. Lukman in the presence of the

Ministry of Petroleum's Legal Director, Grace Taiga –a documented recipient of P&ID's bribes and the late Michael Quinn on behalf of P&ID.  *See* Malami Decl., ¶10.

### 2.   The GSPA Was Not Properly Authorized Under Nigerian Law

The GSPA, was not negotiated in accordance with established FRN protocol for the awarding of government contracts.  *See* Malami Decl., ¶¶8-9.  For example, in violation of FRN's standard operating practices, the GSPA was not offered as part of an open, competitive bidding process, nor was the GSPA pre-authorized by FRN's Bureau of Public Procurement, both of which are necessary preconditions for any petroleum related contract of the GSPA's size and scope.  *Id*. Dr. Lukman's subordinate, Tijani (the recipient of several bribes from P&ID and its affiliate entities), later acknowledged that the GSPA was awarded to P&ID despite P&ID's failure to "show evidence of having executed any gas processing project in the past." *Id* at ¶22.   None of the above necessary pre-conditions were satisfied (or attempted to be satisfied) prior to P&ID bribing its way to the GSPA.  *Id*.  In the absence of full compliance with the above conditions Nigerian law dictates that the GSPA is unenforceable.  *Id*. at ¶9.

### B.   Discovery of P&ID's Bribes and Fraud

Given the size and duration of the GSPA, and the obviously suspicious circumstances surrounding a BVI shell company securing a massive unauthorized government contract under which performance was never attempted, in August 2018 FRN's Economic and Financial Crimes Commission ("EFCC"), opened an investigation into the GSPA, P&ID and individuals and entities connected to P&ID's fraudulent scheme.  *See* Malami Decl., ¶21.  The EFCC's investigations have revealed corrupt practices by P&ID (and its affiliated entities) to individuals that were formerly within the Ministry of Petroleum.  EFCC's investigations were aided by the turnover of financial records by Nigerian financial institutions that the EFCC has discovered were used to funnel

P&ID's (and its related entities') bribes.  For example, on August 26, 2019, bank statements for P&ID (Nigeria) were provided to the EFCC by Guaranty Trust Bank, a Nigerian financial institution.  EFCC's review of P&ID (Nigeria)'s statements revealed large unexplained cash withdrawals and money transfers to its parent, *i.e.* P&ID, which transactions EFCC is continuing to investigate.  *Id*. at ¶18.

The cash withdrawals are not limited to P&ID, but also include P&ID affiliated companies such as Industrial Consultants (International) Limited ("ICIL"), Lurgi Consult Limited ("Lurgi"), and over twenty other companies that EFCC has discovered are directly related to P&ID or its co-founders Michael Quinn (deceased), and Brendan Cahill. *See* Malami Decl., ¶¶18-19.  P&ID used these affiliated companies to facilitate and mask its bribery scheme and funnel payments to FRN government employees involved in the negotiation, supervision and execution of the GSPA. *Id*. at ¶19.  As detailed below, EFCC has directly connected P&ID bribe payments to several former government officials and employees, including two former officials within the Ministry of Petroleum charged with overseeing FRN's legal and technical due diligence of P&ID and the GSPA, namely Tijani and Taiga.  *Id*.

Tijani was Dr. Lukman's Technical Assistant within the Ministry of Petroleum.  Tijani has admitted that he received bribe payments from P&ID, including wire transfers and even a bag containing $50,000 (U.S.) in cash, to turn a blind eye to P&ID's nonexistent infrastructure and comply with Dr. Lukman's directive to guide P&ID to the GSPA.  *See* Malami Decl.,  ¶27, Exhibit 12(A) at Page 5 (Tijani states that he "deliberately overlooked all the shortcomings [of P&ID] in the view of the directives by Dr Lukman to me to give [P&ID] all the support for the company to be recommended along with other investors.").

The circumstances surrounding the $50,000 cash payment are particularly alarming.  In approximately April 2009, following P&ID's submission of its proposal to invest in gas development in FRN, Tijani met with Dr. Lukman and P&ID directors Michael Quinn and Neil Hitchcock at the offices of the Ministry of Petroleum.  *See* Malami Decl., ¶27.  At this meeting, Dr. Lukman (Tijani's boss) directed Tijani to "give [P&ID] all the necessary support in their proposals for the accelerated gas development project."  *Id*., Ex. 12(a), Page 4.  Later that night after a dinner attended by Tijani, Quinn, and Hitchcock, Hitchcock dropped a black bag with $50,000 in cash in Tijani's car, stating that it was a "gift" for his assisting P&ID.  *Id*. at Page 5.

Tijani has cooperated with FRN, and has provided valuable evidence to FRN of P&ID's fraudulent scheme.  In a witness statement that he provided to FRN, Tijani confirmed that when his Technical Team at the Ministry of Petroleum reviewed P&ID's proposal for the GSPA, they discovered that P&ID had "no strong evidence of financial capabilities," and that P&ID had failed to "secure[] the land location in the Calabar Cross-Rivers needed" for the GSPA project.  *See* Malami Decl., Ex. 12(a) at Pages 5-6.  However, having received a $50,000 bribe from P&ID, along with the promise of more to come, Tijani admitted that he "deliberately overlooked all the shortcomings" and instead, stuck to the script given to him by his boss, Dr. Lukman that he was to provide P&ID with all the support they needed.  *Id*. at Page 6.

In addition to receiving direct payments, Tijani has confirmed that P&ID and its affiliate entities made bribe payments to a Nigerian oil company named Conserve Oil Nigeria Limited ("Conserve Oil") owned by his "long-time friend" Babatunde ("Tunde") Odebunmi.  *See* Malami Decl., ¶29.  Tijani has confirmed that at least $30,000 of payments made by P&ID affiliates to Conserve Oil were in actuality payments to Tijani for his assistance in procuring the GSPA for P&ID.  *Id*., Ex. 12(a) at Page 8.

Taiga was the Legal Director at the Ministry of Petroleum during Dr. Lukman's time as head of the Ministry of Petroleum. In exchange for providing legal cover for P&ID, Taiga received over $20,000 in bribe payments from two P&ID affiliated companies, Eastwise Trading Limited and ICIL. *See* Malami Decl., ¶30. As Taiga has never been employed by any of these entities, the only logical conclusion that can be drawn here is that payments were made to Taiga for her assistance in procuring the GSPA. *Id*. at ¶30, Ex. 7 at Page 2. Taiga failed to undertake any genuine due diligence on the feasibility of the alleged project, P&ID's financial resources or its ability to comply with the GSPA in a satisfactory manner. *Id*. at ¶¶25-26. Instead, Taiga completely shirked her duties as Legal Director and conducted no legal due diligence into P&ID, instead misrepresenting that the GSPA posed no risk to FRN. *Id*.

Notably, the only two committees within the Ministry of Petroleum that considered P&ID's proposal for the GSPA and P&ID's ability to perform under the GSPA were the Technical Committee (in respect of which Tijani chaired the technical review of P&ID) and the Legal Committee (which Taiga chaired). *See* Malami Decl., ¶¶22, 24. In addition to the bribery payments to and malfeasance of these known subordinates of Dr. Lukman within the Ministry of Petroleum, FRN has discovered that P&ID colluded with Dr. Lukman's associates to push the GSPA through with no genuine scrutiny.

## C. <u>The Sham London Arbitration</u>

Other than bribing former FRN officials and employees, P&ID does not seem to have done anything to further the GSPA and the project. In fact, P&ID failed to undertake any work in furtherance of the GSPA. *See* Malami Decl., ¶33. P&ID failed to secure the land required for the GSPA project and it never made the investments in human resources, assets or capital to undertake the construction and operation of a gas-stripping plant. *Id*. The only logical conclusion that can

be drawn is that from the outset, P&ID's intent was to transform the GSPA into a claim against FRN, which it could then attempt to pursue through arbitration.  *Id*.

Notwithstanding the illegal nature of the GSPA, and the fraudulent manner in which P&ID procured the GPSA, in August 2012 P&ID commenced arbitration proceedings against FRN under the Nigerian Arbitration and Conciliation Act 2004 (the "Arbitration") seeking billions of dollars in damages for decades of speculative earnings.  *See* Malami Decl., ¶34.  The Petroleum Ministry was exclusively responsible for conducting the Arbitration on FRN's behalf even though, as discussed above, the Petroleum Ministry was the biggest culprit (and based on the investigation to date the greatest beneficiary of bribes within FRN) of P&ID's GSPA fraud.  *Id*. at ¶35.

The Arbitration was conducted in three phases – jurisdiction, liability, and damages.  *See* Malami Decl., ¶36.  The Attorney General at the time, Mr. Mohammed Bello Adoke ("Mr. Adoke"), who in 2019 was charged with facilitating a separate $1 billion bribery and fraud oil license scheme (with Mr. Adoke himself pocketing more than $800,000), selected FRN's legal defense team for the Arbitration.  *Id*. at ¶35. Thereafter, the Arbitration was handled by the then Minister of Petroleum, Ms. Alison-Madueke who also has been charged with corruption in separate foreign corrupt practices.  *Id*. at ¶35.

P&ID's "evidence," was limited to a single self-serving written witness statement from Michael Quinn, one of P&ID's co-founders, who, in 2006 was charged by FRN with espionage and handling secret military materials. *See* Malami Decl., ¶37.  Quinn died shortly after issuing the statement.  *Id*.  Compounding its failure to present a timely defense,  the compromised Petroleum Ministry failed to seek cross-examination of any representative of P&ID, thereby allowing Quinn's self-serving statement about P&ID's financial resources, its purported expertise and infrastructure – all of which FRN's investigation has revealed to be nonexistent –left to stand

unchallenged. *Id*. Based on P&ID's falsified evidence, on January 31, 2017, the Arbitration culminated in a $6.6 billion award against FRN (the "Award"). *Id*. at ¶36. With interest, P&ID claims that the outstanding balance due by FRN to P&ID now exceeds $9.8 billion and grows by approximately $1 million per day. *Id*. at ¶41.

The scale and potentially devastating impact of this fraudulently obtained Award is illustrated by comparison to FRN's key budget expenditures. P&ID's claimed award is nearly five times FRN's 2019 budget for education ($2.07 billion), more than eight times FRN's health budget for 2019 ($1.2 billion) and more than five times FRN's counterterrorism budget ($1.9 billion), and is more than FRN's entire gross foreign reserves. *Id*. Enforcement of the Arbitration award against FRN would devastate the government, the Nigerian economy, and, thus, the Nigerian people.

### D. **Status of The Nigerian Proceedings**

Armed with the above evidence of bribes paid by P&ID and affiliated entities to FRN government officials with oversight responsibilities concerning the GSPA, in September 2019, the EFCC commenced criminal proceedings against Taiga in the Federal High Court in Abuja, Nigeria. *See* Malami Decl., ¶24. Taiga was charged with several offenses, including tax avoidance, failing to register illegal money laundering activities to the proper authorities, and acting without a license. *Id*. During her trial, which is ongoing, and in her witness statements provided to FRN, Taiga admitted that she provided no services for payments received from P&ID or its affiliated entities. *Id*. at ¶¶24-26. As for Tijani, he has admitted to receiving bribes from P&ID and is cooperating with the EFCC and continues to give evidence to its investigators. *Id*. at ¶23.

In addition to these individuals, FRN filed criminal charges against P&ID, and several of its affiliates for money laundering or tax evasion. *See* Malami Decl., ¶¶31-32. Among the entities

charged with facilitating bribes in connection with the GSPA is ICIL, which was owned by Quinn and Cahill, and Goidel, of which James Nolan is a director.  *Id*. at ¶32.  Nolan and Quinn were also directors in P&ID, and Nolan was a signatory on P&ID (Nigeria)'s bank account.  *Id*. Nolan is currently on trial in Nigeria for money laundering and related offenses.  *Id*. at ¶33.  Cahill, Quinn's partner in P&ID, is presently at large.  *Id*. at ¶32.

As for P&ID and its subsidiary P&ID (Nigeria), both have been convicted by the Nigerian High Court of several offenses, including tax avoidance, failing to register the appropriate money laundering authorities, fraud, and acting without a license.  *See* Malami Decl., ¶31.  On September 19, 2019, both P&ID entities plead guilty to criminal charges brought against them by the EFCC.  *Id*.  The Federal High Court of Nigeria ordered the winding up of both P&ID entities and ordered a forfeiture of their assets to FRN.  *Id*.

The investigations by the EFCC and FRN are continuing, including into whether any additional current or former government employees, private individuals, and corporate entities that stood to be enriched by the GSPA or the Arbitration participated in P&ID's fraudulent scheme.  *See* Malami Decl., ¶21.

### E.  <u>The Relief Applicants Seek From This Court</u>

The discovery requested in the United States through this Application will aid FRN's ongoing investigations and prosecutions of the numerous individuals and entities involved in the multi-billion dollar fraudulent scheme related to the GSPA and the ensuing Arbitration.  As the 25% owner of P&ID, a shell company whose only asset is the GSPA and the arbitral award, VR Respondents are likely to be in possession of records concerning P&ID, including, without limitation, documents, communications and records of individuals and entities that Applicants have identified as having materially participated in, and benefited from, P&ID's fraudulent

scheme.  Moreover, FRN's investigations have revealed that, in or around January 2017, P&ID's corporate records stored in Nigeria were destroyed, and thus, as an owner of P&ID, VR Respondents are a logical source for records concerning P&ID since P&ID is not cooperating with the investigation and by its own admission has destroyed corporate records.  *See* Malami Decl., ¶22.

From VR Respondents, Applicants seek discovery related to: (1) documents regarding the acquisition of P&ID by VR Respondents and Lismore; (2) financial records concerning P&ID, its known affiliate entities and their owners (past and current); (3) P&ID's historic and current business operations; (4) documents concerning the negotiation, execution and enforcement of the GSPA; and (5) documents concerning the procurement of and efforts to enforce the Award by P&ID.  Applicants believe that the discovery sought herein will uncover further evidence of bribes and money laundering activity related to P&ID's scheme, as well as the enforceability of the Award.  Applicants satisfy the statutory requirements of Section 1782, and, as the limited discovery that Applicants seek is directly targeted to the ongoing Nigerian Proceedings, the discretionary factors are satisfied as well.  For these reasons, the Court should grant the Application in its entirety and authorize Applicants to issue the subpoena and discovery requests attached to the accompanying Declaration of Alexander D. Pencu ("Pencu Decl.").

## **ARGUMENT**

### A.  **The Requested Discovery Meets The Statutory Requirements Of Section 1782(a)**

The goal of Section 1782 is to "make discovery of evidence for use in foreign litigation simple and fair."  *In re Edelman*, 295 F.3d 171, 173 (2d Cir. 2002).  Section 1782(a) provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other things for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to …the application of any interested

-13-

person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

Courts within this district regularly grant Section 1782 applications for discovery from New York based entities, as well as their directors and officers, in aid of foreign investigations and proceedings, including criminal proceedings. *In re Dickson*, No. 20-mc-51, 2020 WL 550271 *1 (Feb. 4, 2020, S.D.N.Y.) (Abrams, J.) (granting Section 1782 application for corporate records of New York based entity in aid of a Cayman Island insolvency proceeding of the company's 99% shareholder); *In re Petition of Bloomfield Investment Resources Corp.*, No. 18-mc-2608, 2018 WL 6418421 (Dec. 6, 2018, S.D.N.Y.) (Pollack, M.J.) (granting Section 1782 application to obtain discovery from New York based director of entity that had a controlling stake in a Russian company that was the defendant in a civil action pending in the Netherlands); *In re Application of Consellior SAS*, No. 16-mc-00400, 2017 WL 449770 *2 (Feb. 2, 2017, S.D.N.Y.) (Pauley III, J.) (authorizing the issuance of Section 1782 subpoenas for documents and deposition testimony of New York based corporate directors in aid of a French criminal proceeding).

Section 1782 requires Applicants to establish that "(1) the person from whom discovery is sought resides or is found in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, which includes a criminal investigation, and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *In re Application of Chevron Corp.*, 709 F.Supp.2d 283, 290 (S.D.N.Y. 2010). Each requirement is satisfied in this Application.

First, VR Respondents are entities and individuals located in this district and conducting an alternative investment business in this District.  The entities maintain their principal place of business in New York and the individuals reside within New York and thus VR Respondents have

-14-

a systematic and continuous presence within this district for purposes of Section 1782. *See* Pencu Decl., ¶¶7-14.

Second, the discovery sought in the Application is "for use" in aid of a foreign proceeding. The Second Circuit has taken an expansive view of the "for use" requirement of Section 1782, and has emphasized that "an applicant may seek discovery of any materials that can be made use of in the foreign proceeding to increase her chances of success." *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015). Thus, provided the discovery sought is "something that will be employed with some advantage or serve some use in the proceeding," then "an applicant may satisfy the statute's 'for use' requirement even if the discovery [it] seeks is not necessary for [it] to succeed in the foreign proceeding." *Id*. at 295, 298. The discovery Applicants seek is for use in criminal investigations by the EFCC and in criminal proceedings against target individuals and entities that participated in or benefitted from P&ID's fraud, which proceedings are currently pending before the Federal High Court of Nigeria. *See* Malami Decl., ¶¶42-43. The discovery sought in this Application will further support and establish that the individuals and entities targeted in the Nigerian Proceedings participated in the multi-billion dollar scheme to defraud FRN. *Id*.

Moreover, the EFCC and Federal High Court of Nigeria both qualify as "foreign tribunals." The Federal High Court of Nigeria functions as a court of general jurisdiction over both criminal and civil matters. Criminal proceedings pending before the Federal High Court of Nigeria qualify as a "foreign tribunal" under Section 1782, and courts have previously recognized the qualification of such proceedings for purposes of granting relief under Section 1782. *See*, *In re Optimal Investment Services, S.A.*, 773 F.3d 456, 458 (2d Cir. 2014) (holding that Section 1782 "applies to a foreign criminal investigation involving an investigating magistrate seeking documents in the United States"); *see also In re Setraco Nigeria Ltd.*, No. 13-mc-32, 2013 WL 3153902 *2 (Jun.

-15-

19, 2013, M.D. Fla.) (Richardson, M.J.) ("Nigeria's civil and criminal courts qualify as 'foreign tribunals' under Section 1782").

As for the EFCC's pending investigations into individuals and entities which have not yet been charged in a criminal prosecution, the Supreme Court recognized in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), that "Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings," but also includes "investigation[s] … of a criminal, civil, administrative, or other nature." *Intel Corp.*, 542 U.S. at 258 (holding that the Commission of the European Communities charged with investigating alleged violations of the European Union's competition regulations qualified as a "foreign tribunal" under Section 1782). Indeed, there is no requirement that an "adjudicative proceeding" be "pending" or "imminent," as Section 1782 "requires only that a dispositive ruling by the [investigating commission], reviewable by [the] courts, be within reasonable contemplation." *Id*. at 259. Moreover, the Second Circuit in *Mees*, interpreted *Intel* to mean merely that the materials sought should "be [for] us[e] at some stage of a foreign proceeding that was within reasonable contemplation at the time" of the application. *Mees*, 793 F.3d at 301. The EFCC's investigations into P&ID's fraud have provided the basis for numerous criminal proceedings, and convictions, against individuals and entities that participated in P&ID's bribery scheme. *See* Malami Decl., ¶¶20-32. Undoubtedly, the valuable discovery sought in the Application will, insofar as the discovery further corroborates FRN's evidence of P&ID's fraud, form the basis of future criminal proceedings. *Id*. at ¶¶42-43. Thus, the prosecutions and investigations in FRN qualify as foreign proceedings under Section 1782.

Third, Applicants are interested parties under Section 1782. FRN, as a sovereign foreign nation seeking documents in aid of criminal investigations and prosecutions, is an "interested person" under the statute. *See* 28 U.S.C. §1782 (an order for discovery under this section "may be

made pursuant to … [a] request made by a foreign or international tribunal ….").  Furthermore, an "Attorney General [of a foreign nation] is an 'interested person' within the meaning of section 1782," because the term "interested person" is "intended to include not only litigants before foreign or international tribunals, but also foreign and international officials as well as any other person whether he be designated by foreign law or international convention or merely possess a reasonable interest in obtaining the assistance."  *Young v. U.S. Dept. of Justice*, No. 87 CIV. 8307 (JFK), 1988 WL 131302, *7 (S.D.N.Y. Nov. 28, 1988) (holding that the Attorney General of Bermuda, empowered by Bermudian law to "institute … criminal proceedings against any person … in respect of any offence [sic] against any law in force in Bermuda … is clearly an 'interested person' under section 1782.").  Attorney General Malami, as the chief legal officer charged with upholding and enforcing FRN's laws, qualifies as an "interested person" under Section 1782 and is a proper applicant to request the discovery sought in the Application.  *Young*, 1988 WL 131302 at *7; *see also*, *In re Optimal Investment Services, S.A.*, 773 F.3d at 458 (affirming grant of Section 1782 subpoenas for use by a Swiss magistrate in aid of the magistrate's criminal investigation into a Swiss fund manager that invested with Bernie Madoff).

**B.  The Discretionary Factors Weigh In Favor Of Issuing Discovery**

Once all the elements of Section 1782(a) are met, requests for assistance should be liberally granted.  "[D]istrict courts must exercise their discretion under §1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts …."  *In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery*, 121 F.3d 77, 79 (2d. Cir. 1997).  Courts consider four factors in exercising their discretion to grant a Section 1782(a) application: (1) whether the person from whom discovery is

-17-

sought is within the foreign court's jurisdiction; (2) the receptivity of the foreign tribunal to federal court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome.  *Intel Corp.*, 542 U.S. at 264-265.  Each of the discretionary *Intel* factors weighs in favor of granting the Application.

The first factor weighs in favor of granting the Application because VR Respondents are not parties to the Nigeria Proceedings, and as they are businesses that operate in the United States, they are outside of the jurisdictional reach of the Nigerian courts.  *Intel Corp.*, 542 U.S. at 264.

The second factor weighs in favor of granting the Application because FRN is receptive to receiving assistance from this Court in the form of discovery under Section 1782.  Under this factor, courts consider whether a clear policy in the foreign jurisdiction prohibits the use of discovery obtained in the United States.  *In re Euromepa S.A.*, 51 F.3d 1095, 1100 (2d Cir. 1995). Absent such a conflicting policy, assistance under Section 1782 is appropriate.  *Id.*  Nigerian criminal investigative commissions, such as the EFCC, and its courts, are receptive to evidence obtained in a United States judicial proceeding, and no rules or policies exist within FRN prohibiting their use by FRN courts, investigators, or prosecutors in the Nigerian Proceedings.  *See* Malami Decl., ¶42; *see also In re Setraco Nigeria Ltd.*, 2013 WL 3153902 *2.

The third factor weighs in favor of granting the Application because Applicants do not seek to circumvent investigatory restrictions in FRN.  Under the third factor, courts consider whether there are any restrictions under the law of the foreign tribunal against the collection of evidence abroad.  *See In re OOO Promnefstroy*, Misc. No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Sep. 15, 2009).  However, "nothing in the text of [Section] 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there."  *Intel Corp.*, 542 U.S. at 260-263.  The appropriate inquiry under this third

*Intel* factor is whether the Applicants are pursuing Section 1782 discovery in good faith. *See In re Hansainvest Hanseatische Investment-GmbH*, 364 F.Supp.2d 243, 251 (S.D.N.Y. 2018) ("to demonstrate circumvention, Respondents must illustrate … that Applicants are engaged in a bad faith endeavor to misuse Section 1782"). "Section 1782 contains neither a foreign-discoverability nor an exhaustion requirement, and such requirements would seem to undermine the statute's very purpose." *Id*. Nigerian law permits the type of discovery requested in the Application. *See* Malami Decl., ¶42. Applicants in good faith seek permission to obtain limited discovery directly related to the core issues arising out of the Nigerian Proceedings, including VR Respondents acquisition of P&ID, and financial records of individuals and entities that Applicants are investigating and prosecuting for committing, or aiding in the commission of, P&ID's multi-billion fraud. *Id*. at ¶¶42-43. The destruction of P&ID's corporate records has impeded FRN's investigations and it is likely that VR Respondents and its partner Lismore Capital are the sole depositories of documents and information related to P&ID and its fraudulent GSPA scheme. *See* Malami Decl., ¶22.

The fourth *Intel* factor weighs in favor of granting the Application, because the discovery requested from VR Respondents is not unduly burdensome. Moreover, even if the requested discovery were determined to the unduly burdensome it is "far preferable for a district court … [to issue] a closely tailored discovery order rather than by simply denying relief outright." *In re Euromepa S.A.*, 51 F.3d at 1101; *In re Application of Consellior SAS*, 2017 WL 449770 *2.

Here, the discovery requests are appropriately targeted to documents specifically related to VR Respondents' acquisition of a twenty-five percent interest in P&ID, the entity that is at the center of the Nigerian Proceedings. VR Respondents must be in possession of key information and relevant documents concerning the business operations and finances of P&ID and its affiliates. This information and documentation is relevant to the Nigerian Proceedings, because the only

business P&ID ever conducted was the procurement of the GSPA, and the prosecution and the attempted enforcement of the Award.  The documents and information likely to be produced pursuant to this Application include, without limitation, records of payments made by P&ID and its affiliates to individuals and entities that are the target of the Nigerian Proceedings, the existence or lack of P&ID's infrastructure, experience and contractual relationship necessary to carry out the GSPA, the negotiation of the GSPA, the conduct of the Arbitration, and the purported value of the Award as of 2018. As Applicants' discovery requests are narrowly limited in scope and time, and specifically targeted at gathering relevant evidence for use in the Nigerian Proceedings, the granting of this Application and permitting limited discovery is not unduly burdensome.

## CONCLUSION

Applicants' requests fit squarely within the goal of Section 1782(a) to provide equitable and efficient means to assist parties engaged in legal proceedings abroad. As the statutory requirements of Section 1782 are satisfied and the discretionary factors weigh in favor of granting this Application the Court should grant the Applicants' request for discovery.

Dated: May 12, 2020
   New York, New York

         **MEISTER SEELIG & FEIN LLP**

         By:  */s/ Alexander D. Pencu*
           Alexander D. Pencu, Esq.
           Christopher J. Major, Esq.
           Austin D. Kim, Esq.
         125 Park Avenue, 7th Floor
         New York, NY 10017
         Tel: (212) 655-3500
         Email: adp@msf-law.com
            cjm@msf-law.com
            adk@msf-law.com
         *Attorneys for Applicants Federal Republic of Nigeria, and Attorney General Abubakar Malami*