KAMCFEDC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FEDERAL REPUBLIC OF NIGERIA,
et al.,

                Plaintiffs,

        v.                    20MC209
                              Telephone Conference

VR ADVISORY SERVICES, LTD., et
al.,

                Defendants.

------------------------------x
                            New York, N.Y.
                            October 22, 2020
                            2:00 p.m.

Before:

                  HON. PAUL A. ENGELMAYER,

                            District Judge

                    APPEARANCES

MEISTER SEELIG & FEIN LLP
     Attorneys for Applicant
BY   ALEXANDER DIMITRI PENCU
     CHRISTOPHER JOHN MAJOR
     AUSTIN DONG KIM

KOBRE & KIM LLP
     Attorneys for Respondent
BY:  ZACHARY DAVID ROSENBAUM
     DARRYL G. STEIN

KAMCFEDC

```
1            (The Court and all parties appearing telephonically)

2            THE COURT:  All right.  Good afternoon, everyone.

3   This is Judge Engelmayer.  I'm calling the case of Federal

4   Republic of Nigeria, et al. versus VR Advisory Services, LTD,

5   et al., 20MC409.

6            Let me begin by confirming my court reporter is on the

7   line.

8            (Pause)

9            THE COURT:  Good afternoon.  Thank you for your

10  service.

11           Who do I have for the applicants, the Federal Republic

12  of Nigeria?

13           MR. MAJOR:  Good afternoon, your Honor.  This is Chris

14  Major from Meister Seelig & Fein.  We represent the applicants,

15  the Federal Republic of Nigeria and its Attorney General,

16  Malami.  I'm joined by two colleagues, Alexander Pencu and

17  Austin Kim.  We've listed Mr. Pencu as the second potential

18  speaker, although, it's our plan for me, your Honor, Chris

19  Major, to do most of the speaking on behalf of the applicants.

20           THE COURT:  Thank you, Mr. Major.  Appreciated and

21  welcome to your colleagues, as well.

22           Who do I have for VR Advisory?

23           MR. ROSENBAUM:  Good afternoon, your Honor.  Zachary

24  Rosenbaum, Kobre and Kim.  I am joined by my colleague, Darryl

25  Stein, and Josef Klazen.  It is our intention that I will argue
```

KAMCFEDC

1    the first point re in our application and Mr. Stein will argue

2    the second.

3           THE COURT:  All right.  Welcome to both of you.

4           All right.  I have allocated an hour for this.  We

5    have a hard stop at three o'clock.  Before we get into the

6    merits of the dispute, I want to see if counsel have worked out

7    a resolution with respect to the Kobre & Kim Associates.

8           Mr. Rosenbaum.

9           MR. ROSENBAUM:  It does not appear so, your Honor,

10   unfortunately.  To answer the acute question that your Honor

11   posed, I think, again, unfortunately, the parties are in

12   agreement that even if your Honor rules on the issues that

13   we're going to argue today by November 1st, that will not

14   necessarily resolve the issue that we've presented with respect

15   to the impending employment of Mr. Barkhordar.

16          THE COURT:  Mr. Rosenbaum, let me ask you a question

17   or two just about that issue.  To begin with, I take it, just

18   very briefly, because I'm trying not to use up a lot of time on

19   this solvable issue that could be devoted to argument, but was

20   it Kobre & Kim or someone else who fronted the issue or

21   discovered the issue and reported it to the other side of

22   Mr. Barkhordar's having had some prior involvement in his

23   earlier barrister role with the issues at hand?

24          MR. ROSENBAUM:  Our firm learned it had informed

25   counsel for applicants in this proceeding.

KAMCFEDC

1    THE COURT:  Are you able to disclose how your firm

2    learned it?

3    MR. ROSENBAUM:  I could.  Unfortunately, your Honor, I

4    don't know that specifically, but I expect that it was in the

5    course of interviews.

6    THE COURT:  I take it by the time that the issue had

7    arisen, he had already accepted a job offer at Kobre & Kim?

8    MR. ROSENBAUM:  Correct, although, it's a conditional

9    offer.  From what I am told, it was the applicant who informed

10   our firm of his prior employment and the intern informed

11   Nigeria.

12   THE COURT:  The applicant, in other words, did the

13   right thing, as you see it, and was forthright about the

14   potential conflict presented by his earlier work?

15   MR. ROSENBAUM:  He was forthright with us and we were

16   forthright with all counsel for Nigeria, recognizing that this

17   case spans across the globe, or at least to London.

18   THE COURT:  Briefly, Mr. Rosenbaum, let's play out

19   each alternative scenario here.  Let's assume, first of all,

20   that you get what you want, which is that the 1782 order is

21   vacated and there is no subpoena.  Play out that scenario, and

22   that that was ruled on before November 1, why is it that, in

23   the proceedings before me, which, by definition, would have

24   terminated, there is any remaining issue as to Mr. Barkhordar's

25   employment.

KAMCFEDC

1    MR. GREENBLUM:  My understanding, and the petitioners

2    can speak for themselves, obviously, but if your Honor ruled in

3    that fashion, which, of course, we believe the Court should,

4    there would be an appeal, and both for efficiency and other

5    reasons, we would expect to continue to represent our clients

6    on the appeal.  There are potentially other matters that could

7    arise in the United States --

8    THE COURT:  Wait a minute.  Just to be clear, the only

9    application relevant before me involves the proceeding before

10   me and its appeal.  I understand the theory that an appeal may

11   elongate the time, such that any ruling by me isn't a problem

12   solver, but one thing I'm not going to be doing is giving a

13   green light as to the effect on other proceedings of

14   Mr. Barkhordar's prior service.  I can only really opine on

15   whether there is any disqualification in the matter before me

16   and its appellate sequel, but I understand your point, that

17   even if you win, in the event of an appeal, this matter, if you

18   will, is not over.

19   Play out now the other scenario in which you lose, and

20   that order is not vacated and the subpoena is upheld in its

21   entirety, just to choose the polar opposite scenario.  I take

22   it the argument there would be that you would then be appealing

23   and the matter is not completed; correct?

24   MR. ROSENBAUM:  Well, perhaps we would appeal, but

25   irrespective of an appeal, we have served responses and

1    objections to the subpoenas that were served on the respondent,

2    those which we accepted for and would expect then to be

3    involved barring the outcome of an appeal in the discovery

4    process sought by the petitioners here.  So, I think, in that

5    instance, it would result, in turn, in our continued

6    involvement very shortly or immediately after such a ruling,

7    which, of course --

8         THE COURT:  All right.  The relevant takeaway is that

9    the speed of my ruling, because of subsequent events arising

10   out of this petition and the action I take on it is no cure to

11   the problem here.  So, if there is a cure short of

12   Mr. Barkhordar not taking employment, it's either the parties

13   reaching an agreement on a -- somebody is interrupting me, I'm

14   sorry.  Is that the court reporter or otherwise?

15        (Pause)

16        THE COURT:  Who was that?  Who was that that just

17   tried to speak?

18        MR. ROSENBAUM:  This is Mr. Rosenbaum.  It was not me,

19   your Honor.

20        THE COURT:  I'll state the obvious.  This is a phone

21   call.  You can't be interrupting anybody speaking, least of all

22   the judge.  The court reporter needs to hear one voice and one

23   voice alone.

24        All right.  So, I understand why my resolution may not

25   be, by November 1st, may not be a complete solution.

KAMCFEDC

| | |
|---|---|
| 1 | Let me ask you, Mr. Major, briefly, why is it that the |
| 2 | screening mechanism, which, of course, is very familiar to New |
| 3 | York courts, as a means of avoiding exactly this sort of |
| 4 | problem, is not acceptable here? |
| 5 | MR. MAJOR:  Thank you, your Honor.  This is Chris |
| 6 | Major on behalf of the applicant. |
| 7 | First of all, your Honor, just to be clear, that was |
| 8 | not me interrupting.  I was on mute and will continue to be on |
| 9 | mute unless I'm addressed by the Court.  It sounded like |
| 10 | interference to me, not an attempt to interrupt.  I just want |
| 11 | to make clear for the record that that was not me attempting to |
| 12 | interrupt. |
| 13 | So, to answer your question, your Honor, the screening |
| 14 | mechanism, we do not believe, is sufficient for a variety of |
| 15 | reasons. |
| 16 | Number 1, obviously, we are taking this information |
| 17 | from others because English lawyers were not involved in |
| 18 | London; however, our understanding is that the English lawyers' |
| 19 | declaration that was submitted to your Honor does not |
| 20 | accurately and fully state the level of involvement that he had |
| 21 | in this matter.  Our understanding is that he was involved in |
| 22 | numerous strategy and consultation sessions with the client, |
| 23 | with other English counsel.  He had access to strategy |
| 24 | memorandums and had, while it was a short period of time, it |
| 25 | was a very critical period of time in this case. |

KAMCFEDC

1        In addition, we were advised that, while Kobre & Kim

2   is a relatively large law firm with lots of offices, its London

3   office is quite small.  Our understanding is that's somewhere

4   in the high teens in terms of the number of lawyers.  That, in

5   and of itself, makes the screening more difficult.

6        In terms of how this gentleman advised Kobre & Kim of

7   his prior involvement, we can't imagine that he was somehow

8   unaware that this was an issue that just crossed up.  It's not

9   as if he learned subsequently that his prior firm had been

10  involved in a case.  This is a proceeding involving what is now

11  a $10 billion arbitration award.  It certainly was something

12  that would be at the forefront of his mind while he was

13  listening in on all of these conferences and readings of

14  confidential, privileged memorandum.

15       The fact that he then subsequently went and

16  interviewed with Kobre & Kim is alarming, from a U.S.

17  perspective, in terms of a U.S. ethical rule.  He went and

18  sought a job with the adversary on, what I would assume, was

19  the biggest case that he had any involvement with during his

20  prior employment.

21       So, our client here is entitled, under the U.S. rules,

22  to not just ensure that his confidential information is not

23  disclosed, and we're not comfortable that that would be the

24  case, but also, our client is entitled that there not be any

25  appearance of impropriety.  They are defending against a

$10 billion arbitration award that has been set forth in our

papers through the Attorney General Malami's declaration.  It

would be utterly devastating to the entire nation if you look

at it on a scale relative to its fiscal and economic

obligations.

So, given how critical this case is, given that we

think that the lawyer had access to very confidential, very

important legal consultation, and given the fact that we think

he has not properly disclosed that to your Honor in his

declaration is cause for great concern here, and that's why we

don't think that the screening mechanism would be sufficient.

In addition, your Honor, I think, at this point, there

really is -- it should not be anything before this Court.  As

we understand it, and we hope Kobre & Kim has not employed this

gentleman yet, and therefore, there is nothing for us to do in

terms of, for example, seeking disqualification.  Only at that

time would this Court have jurisdiction to issue a ruling.

This is really an issue that has to be determined in

England.  The issue of whether an English law firm can hire an

English lawyer under the English ethical rules where that

English lawyer had been involved in an ongoing, high stakes,

and well-publicized litigation, the first step is whether or

not they can do that under English law, which, of course, I'm

not confident to comment on, but right now there is no ripe

issue before the Court.

KAMCFEDC

1      Kobre & Kim is asking the Court to give an advisory

2  opinion and to give it cover to hire this lawyer.  Kobre & Kim,

3  when they interviewed this gentleman, in their small England

4  office, knew who the barrister was on the other side of the

5  case.  Frankly, this firm and the English lawyer should not

6  have even interviewed, because they both knew about this issue

7  way back then.  So, your Honor, our client feels strongly that

8  the screening mechanism would not be sufficient and we think

9  that, under the rules, our client's informed consent is

10  required, even if the screening mechanism is put into place.

11      Certainly, your Honor, I'll finish -- I'm sorry, your

12  Honor --

13      THE COURT:  That's okay, you've finished.  I've heard

14  enough.  I'm really trying to use time for our argument.

15      Look, Mr. Rosenbaum, first of all, nothing that I can

16  do can reach beyond the scope of this proceeding, if, in fact,

17  as appears to be the case, this is one small chapter in a much

18  broader-running set of engagements between your clients and the

19  law firms here.  Please understand that the most that this

20  Court could do would be limited to the 1782 proceeding.  So,

21  Mr. Major makes an absolutely valid point that there are all

22  sorts of implications here that may exist for your firm and for

23  the lawyer, Mr. Barkhordar, that are untouched by anything that

24  I can do here.

25      So, that much ought to be crystal clear, that the ask

KAMCFEDC

1   here is really limited to, and the remedy here that I could

2   give would be limited to the 1782 proceeding, full stop.

3           What I do think would be useful for me would be to get

4   a detailed affidavit from Kobre & Kim describing to me of what

5   it knew and when it knew it with respect to the issues

6   presented here.

7           Mr. Rosenbaum, can I get that by the end of the day

8   tomorrow?

9           MR. ROSENBAUM:  I believe so, your Honor.  I'll confer

10  with my colleagues and we can inform the Court if there is any

11  reason we cannot, but I expect we can.

12          Additionally, your Honor, it is understood that this

13  Court's jurisdiction is limited to the proceeding before it,

14  but, in fact, there is a proceeding before this Court, and the

15  New York rules apply, and that is the purpose for which we're

16  sending this piece of it to this Court.

17          THE COURT:  May I ask you, the employee says he

18  accepted the offer in September of 2020.  I was first notified

19  of this issue on, I think, October 21st, 2020.  When did Kobre

20  & Kim first become aware that this attorney had any connection

21  to relevant proceedings, Mr. Rosenbaum?

22          MR. ROSENBAUM:  Your Honor, my review of our records,

23  our first communication with counsel, or the Federal Republic

24  of Nigeria, was September 28th, 2020, on this subject.

25          THE COURT:  Kobre & Kim didn't notify the Court and

1    didn't seek relief until 23 days later?

2              MR. ROSENBAUM:  Correct, your Honor.

3              THE COURT:  Help me why I'm supposed to help you with

4    that problem if you were dropping this on me that late?  I'm

5    trying to understand, in other words, there is a think-fast

6    quality about the timing of the application here in relation to

7    oral argument.  The case was pending and it looks like three or

8    four weeks were waited before I was notified that there was

9    this issue.

10             MR. ROSENBAUM:  Understood, your Honor.  It was the

11   discussion between counsel -- I think the expectation from our

12   firm was that it would be worked out and that it was not a

13   substantial issue, particularly because of the willingness to

14   screen.  I can't speak specifically to the English rules of

15   ethical conduct, but I do think they are fundamentally more

16   permissive than the New York rules, and it was on that basis,

17   because New York is not as clear, that we sought to bring it to

18   your Honor's attention once we learned that it was something

19   that the petitioner in this case was unlikely to consent to.

20             THE COURT:  Can I ask you this, I mean, reading

21   through the applicant's application, he was certainly aware of

22   the proceeding.  Could he have been aware of the proceeding

23   during the time he did some work on it without being aware that

24   Kobre & Kim represented an opposite party?  Mr. Rosenbaum.

25             MR. ROSENBAUM:  I believe so, your Honor.  I believe

KAMCFEDC

1    that he --

2            THE COURT:  -- did not know about Kobre & Kim --

3            MR. ROSENBAUM:  -- no, I believe he might have, but I

4    don't know that he did.  So, I haven't met him.  Perhaps that's

5    something that we can speak to in the declaration from our firm

6    that your Honor is asking for.  In other words, I don't want to

7    surmise on facts that I don't know specifically.

8            THE COURT:  I want to know, among other things, when

9    the firm first became aware that an applicant for it had

10   connection to this matter of the sort that he did, when the

11   applicant told the firm and when the firm otherwise became

12   aware of it.

13           Look, may I suggest, Mr. Rosenbaum, to state the

14   obvious, that, apart from any application here, the matter

15   before me is a small part of a much larger problem.  You have

16   here a young person, relatively early in their career, who may

17   or may not want to get caught up in the maelstrom that may

18   ensue, independent of whatever I might decide here.  I would

19   encourage you, after this call, to elevate the issues within

20   the firm and to make sure that the applicant or the conditional

21   offer holder is aware of the whirlwind that may surround these

22   issues.  I want to make sure, before the road is traveled

23   farther, that there is visibility from both employer and

24   punitive employee about what may ensue here.  Okay?

25           MR. ROSENBAUM:  Sure.  Okay.  Yes, your Honor.

KAMCFEDC

1    THE COURT:  With that, I think that is time enough for

2    this issue.  We have 20 minutes per side, not 30.  Let's begin

3    with you, Mr. Rosenbaum.  Mr. Rosenbaum, I have some questions

4    for you, but I'm happy to hear a brief distillation of your

5    own.  Go ahead.

6    MR. ROSENBAUM:  Thank you, your Honor.  And briefly,

7    to start, we searched high and low for any other example,

8    besides the Attorney General of the Federal Republic of Nigeria

9    entering the U.S. not through the MLAT process in seeking aid

10   under Section 1782 for a criminal investigation or a criminal

11   proceeding.  It appears to us -- and the reason I'm only edging

12   slightly on that is because I don't know that we can search

13   every docket of every district court in the country, but we

14   searched high and low and found no other example, which I think

15   is quite telling.

16   THE COURT:  But isn't the example, the previous one,

17   involving this very controversy?  In other words, couldn't the

18   same have been said about the application before Judge

19   Schofield?

20   MR. ROSENBAUM:  Yes, your Honor.  That is one of the

21   handfuls that this issue perhaps could have been raised, but I

22   don't think, in any sense, that forecloses it being raised

23   here.

24   THE COURT:  I'm only pointing out that it's not a null

25   said.  It is indeed an uncommon occurrence that a sovereign

KAMCFEDC

1   entering under the MLAT process, I take that to be your point,

2   but it's not unheard of.

3           MR. ROSENBAUM:  It's not unheard of, but what I'm

4   suggesting is, it's not unheard of for any MLAT signatory

5   except for Nigeria, that we've seen.

6           In that sense, there are two examples, one of which

7   your Honor is directly involved in this one, there is the one

8   before Judge Schofield, and there was the one in 2013 in the

9   Eastern District of Virginia, which was rejected on similar

10  grounds or referred to the same ground that we're seeking today

11  under the discretionary factors of Intel.

12          As we read the petitioner's papers, the gravamen of

13  their argument is not that the Court shouldn't exercise its

14  discretion, it is that the Court does not have discretion.  We

15  think once your Honor concludes that the Court does have

16  discretion under the third Intel factor, that it's a relatively

17  easy analysis, given the comprehensive nature and purpose of

18  the MLAT and Section 1782.

19          THE COURT:  Has Nigeria used the MLAT, to your

20  knowledge, in other cases?

21          MR. ROSENBAUM:  We don't have visibility into that,

22  your Honor, so I do not know.  I do not know whether they

23  attempted it here, and I do not know whether they attempted it

24  in any of the other examples that we've seen that resulted in

25  some public reporting.

KAMCFEDC

1          THE COURT:  Go ahead.

2          MR. ROSENBAUM:  So, in most analyses, we suggest the

3     most natural place to start is with the plain language of

4     Section 1782, and the plain language of the MLAT.  As your

5     Honor is well aware, and it's well established, that the

6     district court in which person resides or shall/may -- and I'll

7     triple underscore, because that's the way it is in my notes --

8     may order him to produce discovery.

9          So, by its very nature, Section 1782 is permissive,

10    and Justice Ginsburg outlined in Intel, the third factor, which

11    is the one that we ask that the Court focus on here, that the

12    Court can and, we submit, should consider whether the 1782

13    request congeals with attempt to circumvent -- and I'm using my

14    own ellipses here -- policies of the United States.

15         THE COURT:  May I ask you this, I mean, I understand

16    your theory that the mere fact that the existence of the MLAT

17    and the election not to use it suggests circumvention.  I

18    welcome your focus on what the proposed subpoena actually

19    contains.  Tell me, what does that reveal?  In other words, is

20    there something about the nature of subpoena itself that says

21    to you, it would not have likely been approved or at least in

22    that scope, in the MLAT procedure.  I'm trying to understand

23    whether we can get any mileage -- you can get any mileage out

24    of the nature of the request here in terms of revealing an

25    attempt to run the MLAT procedure.

KAMCFEDC

1      MR. ROSENBAUM:  I do, your Honor, because I looked

2   both at the MLAT and in the DOJ's guidance.  In the examples

3   that are given in DOJ's guidance, while documents are certainly

4   within the scope of the assistance under the MLAT, the key is

5   identification of the document.  The DOJ even gives examples --

6   we attached it to our handbook or to our submission, but those

7   examples are typically tangible, like bank accounts and records

8   relating to it.

9      Here, you know, and this is -- it really frames, I

10   think, the overarching policy issue and our issue, which is,

11   the Attorney General, Malami, who is, in fact, the central

12   authority for purposes of the MLAT.  And I'll note -- and I

13   don't need to read them all -- there are many instances of

14   "shall" in the MLAT.  It is strewn with the word "shall," while

15   the 1782 has the permissive "may."

16      In that sense, Mr. Malami, Attorney General Malami is

17   attempting to use the convention, the very broad, sweeping

18   conventions of U.S. civil discovery with, I believe it's 56

19   separate requests that are being allocated, go well beyond the

20   specificity that would accompany a request for assistance by

21   the DOJ and are more in the vein of, you know, typical,

22   broad-based, sweeping civil discovery.

23      THE COURT:  I understood your theory, though, to be

24   that the purpose, in fact, of the application here, less to be

25   in truth about a criminal investigation and more to do with

KAMCFEDC

1   undermining the existing arbitral award.  To that point, are

2   there features of the 56 requests that, in your view, can only

3   be understood as aimed at undermining the arbitral award and

4   not at relevance in a criminal case?

5            MR. ROSENBAUM:  I believe so.  This was -- it falls

6   specifically into the second-for-use bucket.  So, I would -- if

7   your Honor wants to hear about it now, I think it's probably

8   better suited for the category that Mr. Stein is prepared to

9   speak to, but the answer, your Honor, is yes.  It appears to us

10  that the request, the 50-some-odd requests for any and all

11  documents in a variety of categories, go beyond an actual

12  subpoena for the criminal proceeding, and essentially a fishing

13  expedition to search for evidence --

14           THE COURT:  Okay, but that's the conclusion.  I'm

15  really trying to get -- and I don't much care whether it's you

16  or Mr. Stein who answers, but just with precision, what are the

17  several calls in the subpoena that, to you, are most clearly

18  indicative that the purpose is to undermine the arbitral award

19  as opposed to build a criminal case?

20           MR. STEIN:  Hello, your Honor.  This is Darryl Stein

21  from Kobre & Kim.

22           I think the clearest example for this is the request

23  of all documents and communications concerning the enforcement

24  of any award granted in the arbitration in connection with the

25  GSPA.  This really exemplifies the breath of this request,

KAMCFEDC

1   which is aimed -- we cannot see any connection to the criminal

2   proceedings and the initial proceedings in Nigeria, which, I

3   think, themselves are somewhat [unintelligible] but there

4   really does seem there to be targeted only at sorting out and

5   adversaries litigation strategy and without any connection to

6   the investigations and proceedings in Nigeria.

7        THE COURT:  What is your understanding, Mr. Stein, as

8   to, as best you can tell, the focus of the criminal

9   investigation?

10        MR. STEIN:  It's a little bit difficult to tell, your

11   Honor.  The way it's defined in the application is criminal

12   investigations and initial proceedings pending in Nigeria.  In

13   the opposition to the motion to dismiss, they identified five

14   criminal proceedings involving certain individuals.  It's

15   unclear to us what the scope is of either of those

16   investigations.  I think one of the issues that we had and one

17   of the problems with the application is that, that failure to

18   specify what the ongoing proceedings are, having not identified

19   them by party name, by case number, and even saying that the

20   list that they provided, the examples they provided are not

21   evolved, it's somewhat difficult.  We haven't seen, I think,

22   other situations where an application is quite as vague as to

23   what the supposed foreign proceedings are.

24        THE COURT:  Let me ask you, Mr. Stein, I mean, I

25   understand that evidence has been adduced of payments that have

KAMCFEDC

1    been made that at least are suggestive of some, or are perhaps

2    consistent with an attempt to corrupt.  I understand those two

3    have been made more at the earlier stage of the contracting

4    process and not at the arbitral enforcement process.  Are you

5    aware, from your involvement of the case, of any payments that

6    have been made, or anything that is untoward getting to the

7    arbitral enforcement.  In other words, once the arbitral award

8    is involved, has there been any suggestion of illegality,

9    impropriety from that point forward in the chronology?

10          MR. STEIN:  I don't believe that there are any

11   allegations as to the role of when VR and P&ID became involved

12   in this.

13          One thing, I think it's important to note, the

14   arbitration rules issued in early 2017, the respondents had no

15   connection to P&ID before that date, the allegations that have

16   been made against the initial contracting.  I note Nigeria has

17   made a number of allegations, and those are the subject of the

18   proceedings that are going to be taking place in England, that

19   I'm not aware of any allegations concerning misconduct and the

20   enforcement of the award.

21          THE COURT:  When did VR acquire a quarter of P&ID?

22          MR. STEIN:  I don't have the date in front of me in

23   which they finished the opposition.  In connection with the

24   other 1782 proceeding, we've discussed this with counsel for

25   Nigeria.  What we told them is that the discussions between VR

KAMCFEDC

1    and P&ID only started in August of 2017, which is several

2    months after the arbitrational award was issued.

3            THE COURT:  But the documents that are being sought

4    from VR predate 2017?

5            MR. STEIN:  It appears to be.  I'm sorry, your Honor.

6            THE COURT:  Go ahead.  In other words, I'm trying to

7    understand the materials that are sought from VR presupposes

8    they're a custodian of records that predate when the

9    discussions began between VR and P&ID; is that correct?

10           MR. STEIN:  I believe it's helpful to look at the

11   request in two categories.  I think the first category are the

12   requests we have focused on before, which are those requests

13   aimed at sorting out the litigation strategy against Nigeria.

14   So these are the documents concerning the enforcement of any

15   award.

16           There is a second category of documents, which it

17   seems as though Nigeria's supposition is that VR might have,

18   because P&ID previously had them and they attached this exhibit

19   claiming that the documents were destroyed in 2016, and that

20   seems to be part of the basis for their application here.  Of

21   course, the timeline for that doesn't match up, and to the

22   extent that Nigeria is seeking documents, that are really P&ID

23   documents, you know, that's an example of a situation where

24   discovery would not usually be -- or it wouldn't go against a

25   grant of discovery when the real party for whom discovery is

KAMCFEDC

1    sought is a party to the foreign proceeding.

2            THE COURT:  All right.  I want to give you a few

3    minutes to reply, you've got about five minutes left of your

4    20.  So, what I would propose to do, Mr. Rosenbaum and

5    Mr. Stein, unless you have something specific you would like to

6    put on the table before I turn to Nigeria, I propose that we

7    turn to Nigeria.

8            I did have one process question I want to ask, but let

9    me just, before I do that, is there anything further you want

10   to put on the table, Mr. Rosenbaum, before I turn to Nigeria?

11           MR. ROSENBAUM:  No, your Honor.  We appreciate a few

12   minutes to rebut.

13           THE COURT:  Thank you.  Let me ask you the one

14   question, which is, the application for discovery lists a

15   Richard Dietz as an officer or director, and also VR Capital

16   Group.  It doesn't look to me as if your submission lists them

17   as one of the respondents.  It's unclear where they fit in.

18   Did you mean, by your response, to capture the entirety of the

19   respondents here?

20           MR. ROSENBAUM:  No.  There were -- there are eight

21   enumerated respondents, we have appeared on behalf of six.  The

22   reason for that is we accepted service for those six on the

23   basis that they can be found in this jurisdiction and the other

24   two cannot.  We had some email exchanges with counsel for the

25   petitioner and, to my knowledge, the petitioners have not

SOUTHERN DISTRICT REPORTERS, P.C.

1    advanced efforts to serve those other two respondents with

2    process.

3         THE COURT:  So, formally, if your application to

4    vacate were granted, would it -- although the logic of any

5    ruling like that, conceivably, could logically run to the

6    benefit of those two people, perhaps.  As a formality, would I

7    be vacating the entirety of the application or only such part

8    as ran to the six who you represent?

9         MR. ROSENBAUM:  Well, I think, as a matter of

10   procedure, it would run into the six.  I think there would

11   likely be collateral estoppel issues if there is an attempt as

12   to the other two.  But, as to those two, there is a separate

13   basis under 1782 because, we would submit, they're not found in

14   this jurisdiction, and that was the basis on which we were not

15   authorized to accept service.

16        THE COURT:  I mean, I suppose the point would be that

17   when and if those people are served and surface, it's for them

18   to oppose, and if they oppose, at that point, whatever the

19   arguments are about the relationship between any ruling here

20   and them could be ventilated.

21        MR. ROSENBAUM:  Agreed, your Honor.

22        THE COURT:  All right, with that, Mr. Major, I'm happy

23   to turn to you.

24        MR. MAJOR:  Thank you very much, your Honor.

25            Before I start my argument, I want to make a factual

KAMCFEDC

1    point.  Your Honor had asked if there were payments after the

2    arbitration and after the arbitration award.  I would point the

3    Court, please, to 27-1 on this docket, which is the recent

4    English judgment.  Prior to that, at page 20 of that document,

5    that's the ECF pagination, paragraphs 121 and 122 discuss --

6    and this was, obviously, the high English court, which found a

7    strong prima facie case of fraud, it cites payments to

8    Ms. Taiga, the government lawyer charged with reviewing the

9    GSPA, which is the agreement that gave rise to the arbitration.

10   It recites payments to Ms. Taiga in 2017, 2018, and 2019.

11        I just wanted to make sure the record was clear on

12   that actual point.

13        THE COURT:  Are those payments in connection with

14   arbitral enforcement?  What is she up to at that point?

15        MR. MAJOR:  Your Honor, obviously, I don't know what

16   was in Ms. Taiga's head or the payor's head, but the

17   implication, I think, is that it was either, you know, hush

18   money, knowing that the investigation had commenced in Nigeria,

19   I think that is a likely and a very reasonable conclusion to

20   draw, but, of course, I don't know what exactly the quid pro

21   quo was.  The fact that, while the Nigerian Economic and

22   Financial Crimes Commission was investigating the fraud, and by

23   then, the funds that had bought P&ID, the shell company that

24   holds the award, while they were attempts enforcement,

25   Ms. Taiga is receiving sums that are of multiple of an annual

1   salary in Nigeria for a government employee.  Those payments

2   are, to state the obvious, highly suspicious, and I think

3   indicative of her failure of cooperation, whether that be

4   through an affirmative cooperation or to her remaining silent.

5             THE COURT:  What I don't understand is where she fits

6   in into the events necessary to achieve enforcement.

7             MR. MAJOR:  So, your Honor, obviously, she received

8   payments at the time she was approving the contract, and her

9   daughter received payments, but the EFCC was investigating this

10  fraud at that time.  So, she's receiving additional payments,

11  probably to induce her not to tell the EFCC what she knew,

12  which was that it was fraudulently procured, that there was

13  nothing behind the company that got this GSPA, that there was

14  no proper due diligence performed, that it wasn't channeled

15  appropriately within the Nigerian government.  All of those

16  things, the perpetrators of the fraud and the subsequent

17  acquirers of the fraudulent award knew that those types of --

18  that type of information could undo the award.  Look what

19  happened in England.  They are now facing a fraud trial, and

20  the court in England has already found that there is a strong

21  case of prima facie fraud, in part based on the investigation

22  concerning Ms. Taiga.

23            So, I think that it appears to have been unsuccessful

24  because Nigeria was able to gain this information, including

25  through the other Section 1782 proceeding that was brought, but

KAMCFEDC

it appears to me that the intent was to try to keep her from

cooperating or otherwise speaking and providing information to

the investigation that could ultimately lead to criminal

prosecutions of the perpetrators of the fraud.

THE COURT:  Thank you.  That's responsive and helpful.

Just as to VR Advisory, what's the basis for the

premise that they are custodians of documents that predates the

date on which your adversary said discussions first began with

them and P&ID?

MR. MAJOR:  It's our expectation that if VR Advisory,

for example -- and VR Capital was the other purchaser of the

entity holding the award.  They, presumably before spending a

considerable amount of their investors money on this award,

would have done some form of due diligence, would have had some

communications with persons who were involved with the

arbitration with the underlying fraud, perhaps.  We haven't

heard from VR Advisory or the other respondents that they have

no such documents.  They're trying to evade having to produce

documents and, presumably, the manner in which they contested

this proceeding demonstrates that, in fact, they know they have

documents.

THE COURT:  Wait a minute.  Wait.  Wait.  Wait.  Wait.

Enough.  The question I asked you is what the basis is for your

premise that they have the documents and the thrust of your

answer is due diligence, I get that.

KAMCFEDC

1          The fact that a party opposes production of documents

2     or opposes a subpoena does not mean anything, other than

3     they're standing on their legal rights.  I'm not inferring

4     something from somebody standing on their legal rights.

5          All right, let's turn to the MLAT.  In Nigeria, who is

6     it that would have to approve a request for an MLAT?  What's

7     the position or the title?  Is it the Attorney General?

8          MR. MAJOR:  Yes, your Honor.  Obviously, I'm not an

9     expert on Nigerian law or exactly how the law enforcement rules

10    work there, but, presumably, that would be Attorney General

11    Malami.

12         THE COURT:  We have limited time.  I'm not sure why

13    you're not expert on that, since that is really a central

14    argument the other side made, but your clients include the

15    Attorney General; correct?

16         MR. MAJOR:  Correct, your Honor.

17         THE COURT:  What efforts did your client make before

18    filing the 1782 to pursue an MLAT as to the VR Advisory?

19    Please be as detailed as you can.

20         MR. MAJOR:  Your Honor, I'm not aware of any effort,

21    at all, to pursue an MLAT.

22         THE COURT:  Did your client reach the conclusion that

23    such an MLAT would be fruitful?

24         MR. MAJOR:  No.

25         THE COURT:  Did your client consider an MLAT?

KAMCFEDC

1    MR. MAJOR:  Not to my knowledge.

2    THE COURT:  Why did your client not consider an MLAT?

3    MR. MAJOR:  Because, your Honor, the discovery that

4    we're taking in the first Section 1782 proceeding and this

5    Section 1782 proceeding don't require any special skill or any

6    unique pursuits that would require engagement with the

7    Department Of Justice.  The MLAT is --

8    THE COURT:  I'm sorry, I used to work for the

9    Department Of Justice and get MLATs all the time to other

10   countries.  It wasn't that I had a special skill, but it was

11   that I was a criminal prosecutor investigating a crime to which

12   foreign evidence was relevant.  There is nothing special about

13   that.  It's just following smoke to see where there is fire.

14   You need to answer the question.  Would an MLAT not

15   have worked here?  Did Nigeria have a policy of not using the

16   MLAT treaty?  I need an answer for why that was foregone.

17   MR. MAJOR:  Your Honor, it was foregone because

18   Section 1782 is available to Mr. Malami and Nigeria.  There is

19   nothing in the MLAT that could or would restrict Attorney

20   General Malami's use of Section 1782.  That is something that

21   is --

22   THE COURT:  Sorry.  Sorry.  Sorry.  I understand that

23   you chose to do 1782, that's evident in your choice of the use

24   of 1782.  I'm trying to understand whether the judgment was

25   that an MLAT would be less effectual.  In other words, maybe

KAMCFEDC

1    the Attorney General was unaware of the MLAT -- I suppose I

2    would ask about that.  Was your client aware of the existence

3    of the MLAT procedure at the time your client chose to pursue

4    1782?

5              MR. MAJOR:  I would think, of course, your Honor.

6    Yes.

7              THE COURT:  So, on the assumption that your client was

8    choosing what way to proceed, do you have any insight in the

9    reasoning your client had in not first pursuing relief under

10   the MLAT?

11             MR. MAJOR:  Yes, your Honor.  We can get these orders

12   very quickly, as your Honor knows.  Your Honor gave us the

13   Section 1782 order quickly.  The suggestion by the other side

14   is that we should have gone through the Justice Department and

15   then had the Justice Department file a Section 1782.  That

16   doesn't coincide with the twin purposes of the statute, which

17   are efficient discovery, and I say Section 1782, efficient

18   discovery, and also to encourage other countries to follow suit

19   and also give cooperation to foreign proceedings, including

20   proceedings in the U.S.

21             THE COURT:  Can I ask you a question?  That logic

22   would apply literally in every case where a foreign government

23   is seeking to build a criminal case.  They could, in any case,

24   say, you know what, those courts are faster than those DOJ

25   bureaucrats, let's not use the MLAT because we're experiencing

1     that judges are quicker, and we don't have to go through the

2     search-and-review and approval mechanisms in DOJ.

3             Is there something that distinguishes this case from

4     other criminal cases that a foreign sovereign might want to

5     bring through the use of American evidence?

6             MR. MAJOR:  Your Honor, there would be some

7     distinction with other cases, but the point is not there was

8     something special about this case that leads it to Section

9     1782, it's the respondent's claim or they speculate that,

10    somehow, relief would have been denied under the MLAT.  If you

11    look at article 3 of the MLAT, the four enumerated basis for

12    denying assistance, none of them apply to what the respondents

13    have argued here.  In article --

14            THE COURT:  Sorry.  What is Nigeria's experience,

15    though, with seeking assistance under the MLAT treaty with the

16    U.S.?

17            MR. MAJOR:  Your Honor, I don't know what the

18    historical experience has been.  As counsel for the respondents

19    have noticed, that would be things that are not necessarily a

20    matter of public record, and so I can't --

21            THE COURT:  Wait a minute.  Your client is the

22    Attorney General.  Your client is party to a treaty with the

23    United States governing mutual assistance in criminal matters.

24    I'm asking you why your client has forgone this.  The answer is

25    because those courts, under 1782, are faster.  I'd ask you to

1     distinguish this case from other cases and why that wouldn't

2     invite world wide ignoring of MLATs by any other criminal

3     sovereign.  You've been unable to distinguish the case.  I've

4     asked you whether or not Nigeria has had a bad experience with

5     MLATs, you told me you can't answer.  I need some help here.

6             MR. MAJOR:  Your Honor, the burden is the not on us to

7     demonstrate why the MLAT is not the sole proffer for us here.

8     We have a right, under Section 1782, that right is not

9     disturbed at all by the MLAT.  The statutory requirements of

10    Section 1782 have been met.  The Court found that when it

11    issued its order --

12            THE COURT:  Sorry.  Sorry.  Mr. Major, the Court found

13    that on the basis of your ex parte application.  This is

14    exactly why the adversarial system is such a wonderful part of

15    the American legal system; I get to hear from the other side.

16            One of the things I learned, that I didn't know from

17    your submissions, but which I learned from the other side, was

18    the representation that was made to Judge Schofield in which

19    you said, or your client told Judge Schofield that it was,

20    quote, rank speculation that an applicant might seek to use the

21    materials produced in those proceedings in, quote, other

22    proceedings.  According to your adversary, that turned out to

23    be untruthful.

24            Is it factually correct that the materials that were

25    elicited from the earlier 1782 proceeding were, in fact, used

KAMCFEDC

1      in other proceedings?

2              MR. MAJOR:  There were a few transfers that were

3      discovered in Judge Schofield's Section 1782 proceeding that

4      were in accordance with Second Circuit precedent, and it's

5      permissible, that were submitted to the English court.

6              At the time of that briefing that your Honor

7      references, no documents had been produced.  We didn't know

8      what documents we were going to get, we didn't know how the

9      Federal Republic of Nigeria would view those, or where, in what

10     proceedings, they would be useful.

11             So, the Second Circuit has been clear, though it is

12     permissible for the recipient of documents to use them in other

13     foreign proceedings and, in fact, the Eleventh Circuit has even

14     found you can use them in subsequent U.S. proceedings --

15             THE COURT:  I'm focusing on your honesty before --

16     your client's honest before Judge Schofield.  In the

17     application to Judge Schofield, you talked about people in

18     Nigeria who engaged in corruption, some of whom are former

19     Nigerian public officials that received bribes at P&ID.  That

20     was the information you were seeking through the 1782

21     application.  It's the sort of information that you say that,

22     when you got it, surprised you, though, and you therefore

23     turned it over, but before Judge Schofield, you said it was

24     rank speculation, and you did just that.

25             Did your law firm represent Nigeria in the application

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1    before Judge Schofield?

2            MR. MAJOR:  Yes, your Honor.

3            THE COURT:  Why did you tell her it was rank

4    speculation that you would do what you did with the evidence

5    you were seeking?

6            MR. MAJOR:  Because we did not know what we would

7    receive in response or how it would be used.  We're not in any

8    of the foreign proceedings.  We're obviously not doing the

9    Nigerian investigation, we're not the English barristers

10   presenting evidence to the English court, we did not know what

11   we were getting.  The other side was arguing that the 1782

12   should not be permitted because the material might be used

13   otherwise.  We argued that we can --

14           THE COURT:  Actually, the other side didn't oppose the

15   1782.  They sought access to the materials and you sought to

16   deny that to them by making your rank speculation point.

17           The problem I'm having, among many things, is the

18   atomization of the representation of Nigeria where Nigeria is

19   essentially not harming with you with information about what

20   its other representatives will do with the information it gets.

21           So, I'm ascribing to you good faith in telling Judge

22   Schofield that, of course my client wouldn't do that with the

23   evidence or bribes that we're seeking, and then Nigeria turns

24   around and does it, and the defense is, we poor little local

25   American counsels didn't know that our client would do that.

KAMCFEDC

The problem is now Nigeria is now back before me.  Why isn't a
compelling discretionary factor under the Intel factors that
Nigeria has blown its credibility with the Southern District of
New York?

MR. MAJOR:  Your Honor, respectfully, I do not think
that they've blown their credibility --

THE COURT:  I'll be the judge of that.  Why should I
treat them as honorable, when they said to Judge Schofield they
were seeking exactly the evidence that they got?

MR. MAJOR:  Your Honor, the investigations that are
ongoing in Nigeria have yielded evidence that has then been
used in the English courts, but there is nothing impermissible
about that.  That is not -- the discretionary factors do not,
you know, it covered this type of information where I don't
think that the Court can say that I -- first of all, I don't
think that Nigeria has blown its credibility with the Southern
District of New York.  That's not one of the discretionary
factors for the Court to consider.

THE COURT:  I can consider whether it's an end
runaround or other proof-seeking mechanisms and so forth.
Presumably, one issue is whether I can bank what
representations Nigeria is making to me, and one of the better
indications of that is whether their representations to Judge
Schofield proved accurate.

MR. MAJOR:  Your Honor, we argued to Judge Schofield

1   not that it was just speculation at that point in time about

2   where the materials may be used, but we argued that we had the

3   entitlement under Second Circuit precedent for the materials to

4   be used in other foreign proceedings.  There is nothing

5   impermissible about that.

6        THE COURT:  May I ask you, I note that this time

7   around, although the argument is that you're seeking the

8   information from VR Advisory, principally for criminal

9   proceedings, this time you are not ruling out the secondary use

10  of that material in the English proceedings; is that correct?

11       MR. MAJOR:  Yes, your Honor, and I don't think we

12  ruled it out.  I understand the rank speculation, but our

13  point, at that point in time, was that it was not known where

14  it was going to be used, but we did not rule it out.  We argued

15  that it could be used in other foreign proceedings.  We made

16  that argument, we cited the case law, and I just want to

17  emphasize that point because, obviously, when candid to the

18  Court, when called into question, that raises a large concern

19  for us, but we were not saying that it wouldn't be used.  What

20  we were saying is that the argument, at that point in time, had

21  no factual basis.

22       THE COURT:  May I ask you, if you weren't seeking the

23  information from VR for a criminal investigation purpose, but

24  solely for the English proceedings, would 1782 be available to

25  you for that use?

KAMCFEDC

1        MR. MAJOR:  Yes, your Honor, absolutely.

2        Another point about the speculation was, what was

3   happening in England at the time of that briefing, was that the

4   Federal Republic of Nigeria was trying to get permission to

5   bring the case.  Now we know from the English judgment that was

6   handed down a few weeks ago, they can bring that case and will

7   bring that case.  Therefore, it is likely, that if there is

8   fruitful information discovered, that it will not only be used

9   for the foreign investigation that's going on in Nigeria, but

10  it will also be used in the English court as the Second Circuit

11  explicitly permits.

12       If I can make one point about the overall argument

13  that the respondents have, they're telling your Honor --

14  they're asking you to make a discretionary call.  That's not

15  all that they're asking.  They're asking your Honor to find

16  that there a blanket prohibition against the Attorney Generals

17  of other countries in using Section 1782.  That is completely

18  contrary to the statute --

19       THE COURT:  I mean, maybe that's their intention.  I

20  didn't read their papers that way.

21       Let me ask you just to their point.  Other than the

22  applications from Nigeria, have you been able to find examples

23  where a foreign criminal prosecutor, not Nigeria, was granted

24  judicial assistance under 1782 without availing themselves of

25  the MLAT procedure first?

KAMCFEDC

1    MR. MAJOR:  No.  The only thing that holds otherwise

2    is the case in the Eastern District of Virginia was wrongly

3    decided.  The quote from the case, it says that it miscites or

4    misrecites the Intel factor, factor 3.  It circumvents the

5    procedure that the Government of the United States or the

6    Government of the Republic of Nigeria had established referring

7    to the MLAT, but the Intel factor actually says it circumvents

8    the foreign proof gathering restrictions or other policies of a

9    foreign state of the U.S.

10    I think your Honor's question a little earlier raised

11    this point, which is, is there a policy of the U.S. that would

12    prohibit the production of these documents that we're asking

13    for, and there is.  The Section 1782 permits it.  Counsel for

14    the respondent here conceded that we met the statutory

15    requirements in the earlier Judge Schofield proceedings.

16    So the statutory factors having been met, the

17    respondents are searching for a way to somehow delay or avoid

18    discovery and citing to the MLAT, but the MLAT, by its own

19    terms, provides no limitation under Section 1782, and quite to

20    the contrary, article 19 specifically says that it does not

21    limit procedures of other law, including, obviously, the

22    statutes of the United States.

23    THE COURT:  Okay.  Thank you, Mr. Major.  Just brief

24    couple of minutes of rebuttal, if any, from Mr. Rosenbaum.

25    MR. ROSENBAUM:  Your Honor, I'll be very brief because

1    I know the Court is pressed for time.

2            The third intel factor is an attempt to circumvent

3    policies of the United States.  The linear policies of the

4    United States that are actually memorialized in the MLAT, I

5    think there was some discussion around one or two, but I think

6    I did put a fine point on it.  For example, as I mentioned,

7    Attorney General Malami is the central authority.  The MLAT

8    proscribes that these central authorities, meaning Mr. Malami

9    shall, not may, communicate directly with each other, meaning

10   he shall communicate with the U.S. central authority for the

11   purposes of this treaty.

12           So, further --

13           THE COURT:  I'm sorry, Mr. Rosenbaum, that's just

14   process.  In terms of the output that would likely have arisen

15   had Nigeria pursued the MLAT, is there some reason to think

16   that emerging from the MLAT process would be a more

17   stripped-down, approved set of document or information

18   requests?

19           MR. ROSENBAUM:  I believe so, your Honor, for the

20   reasons I outlined earlier.  The structure of the MLAT and the

21   DOJ guidance does not call for, in my view and from what I've

22   seen, these types of sweeping requests.  There is more

23   specificity towards the documents requested, not a broad

24   category, but -- so that's specific here.

25           As to some of the more sweeping issue, first of all,

KAMCFEDC

we are not seeking an outright prohibition.  We've said, on

multiple times, that we are seeking to exercise the Court's

discretion.  Supreme Court juris prudence going back centuries

requires that the Court put a treaty and statute on equal

footing, and whenever possible, reconcile that.

Here, when you look at the specificity of the MLAT,

the standard procedure, as it appears for every MLAT

participant, except for Nigeria, even some of the permissive

pieces of an MLAT, for example, the U.S. central authority, in

this instance, may deny -- this is article 3, section 1, sub

part D., if the executioner requests, and is contrary with our

constitution, which we talk about in our papers, but also if

there was prejudice with security or other essential national

interests of the state.

Now, we do not know, we, as VR, do not know whether

that could or would be the case, but that's the exactly why the

first stop in this sequence, we submit, as a matter of

expression, not as a matter of prohibition, should be and

universally is, except here, through the MLAT with the DOJ.

THE COURT:  Let me ask you this, I mean, you're not

saying that the MLAT requires, in every case, that it be used

ahead of any civil statute, like 1782.  You're saying that

that's the ordinary course.  There's no law that literally

holds what you are saying, that the MLAT has to take priority.

You're describing committee and general practice, but not some

KAMCFEDC

1    legal prohibition; right?

2            MR. ROSENBAUM:  Correct.  We're urging the Court to

3    reconcile the treaty with the permissive.  That's why I

4    underscored it at the outset, the nature of 1782, and we think

5    the way to harmonize that is with sequence, not prohibition.

6            THE COURT:  If the U.S. Justice Department approved

7    three out of the 50-some-odd document calls here and didn't

8    approve the rest, and Nigeria then said, you know what, on top

9    of those three, there are five, or six, or seven we really,

10   really want, and we're going to pursue those under 1782.

11   Wouldn't your first argument be, you can't do that, you went

12   through the MLAT and the MLAT procedure resulted in your being

13   limited to just three, not the additional seven or so?

14           MR. ROSENBAUM:  Your Honor, I believe we would be

15   still in the discretionary realm of 1782, not the mandatory.

16   So, yes, I can't imagine a world in which we wouldn't make that

17   argument, but we would make it as a matter of discretion.  I

18   think the key to this is the Court would, in that instance,

19   have the benefit of the DOJ's reasoning in exercising its

20   discretion, which is why we submit -- and I can't think of a

21   reason contrary to this, which is why I think it is the

22   universal practice --

23           THE COURT:  I'm sorry.  Why would you have the benefit

24   of DOJ's reasoning?  If DOJ turned away certain requests, would

25   that ordinarily be made known to the subpoena recipient, or

KAMCFEDC

1    would all that would that be made known be that DOJ had

2    approved the three document calls that it approved?

3           MR. ROSENBAUM:  Well, I think we naturally know it

4    because that presupposes that Nigeria would then come back

5    apart from the -- if I'm understanding the hypothetical

6    correctly, if Nigeria would come back to the court to 1782 and

7    seek the other two.

8           THE COURT:  No.  What typically would happen in an

9    MLAT would be, if the MLAT process only resulted in the

10   approval of a small subset of what Nigeria was seeking, that

11   would be what VR Advisory would be ordered or would be

12   subpoenaed to produce pursuant to the MLAT, but there wouldn't

13   be some internal administrative opinion coming out of DOJ that

14   VR Advisory would know of, to the effect that DOJ had chosen

15   not to approve the lie and share of what was proposed to it.

16   You might discover that through informal discussions or perhaps

17   you might be compelled to in a later 1782 proceeding if the

18   Court asked you the question, but in the ordinary course, I

19   don't think it would be visible to you what DOJ had not

20   approved, only that which it had approved.

21          MR. ROSENBAUM:  I agree with that, your Honor.  I may

22   have been misconstruing the hypothetical.  I thought there was

23   a second leg of it where Nigeria subsequently sought the other

24   two or ten that were rejected by the DOJ through a direct

25   1782 --

KAMCFEDC

```
 1          THE COURT:  Right.  The issue would then be you
 2   wouldn't necessarily know.  You would presumably then say, hey,
 3   you should go to the MLAT for that, too, and then maybe it
 4   would get smoked out that that had already been tried.
 5          Can you conceive of any circumstance where any foreign
 6   executive branch could justifiably not pursue an MLAT in the
 7   first instance?
 8          MR. ROSENBAUM:  Meaning in a criminal proceeding?
 9          THE COURT:  Yes.
10          MR. ROSENBAUM:  I think that -- I can't conceive of
11   one.  There perhaps would be, and I think, in some
12   circumstances, the Court certainly could exercise its
13   discretion to allow it.  We submit that, where there is an
14   MLAT, and, again, as a matter of discretion and sequence, the
15   Court should exercise discretion at first to have Nigeria first
16   exercise its right through the MLAT, which, by the way, as we
17   all know, then typically results in a 1782 proceeding that's
18   advanced by the U.S. Department of Justice.
19          THE COURT:  One final question for you.  You heard me
20   question your adversary about the representation that was made
21   to Judge Schofield.  I take it your firm was not involved at
22   that stage?
23          MR. ROSENBAUM:  Our firm was involved.  My colleagues
24   on the line were directly involved.  I believe we were the
25   recipients of the representation, yes.
```

KAMCFEDC

1      THE COURT:  Right, but at that time, though, I thought

2   the subpoena was directed at -- was it directed at VR advisory?

3      MR. ROSENBAUM:  Yes, it was directed at certain

4   financials institutions.  We were involved on behalf of P&ID in

5   that proceeding, but we were not representing any of the

6   subpoena recipients.

7      THE COURT:  When the statement was made that it was

8   rank speculation, what do you understand of the context of that

9   proceeding at that time, that to connote.

10      MR. ROSENBAUM:  To me, that would connote that counsel

11   was informed that there was no intention to use that

12   information in the English proceeding.  I don't know any other

13   way to interpret this.

14      THE COURT:  The information that was sought, I mean, I

15   read the papers, as you can tell, to be seeking information

16   including, quote, bribe payments, meaning things of value and

17   so forth.  Did what was produced in response to the 1782 depart

18   from what was forecast or sought in the declaration seeking the

19   1782 by Nigeria?

20      MR. ROSENBAUM:  From what I understand, the request

21   was somewhat broad, but there were bank records and it was bank

22   records that were produced.  I don't know if that fully answers

23   your Honor's question.  I only want to provide what I know.

24      THE COURT:  -- speculation that really potent evidence

25   would be produced, as opposed to bank records that were a

KAMCFEDC

1    nonevent.  I'm trying to figure out whether the word "rank

2    speculation" can be justified on the grounds of, sure we were

3    hoping to get a smoking gun, we never really were anything more

4    than speculating that was there, and lo and behold, we got it.

5         MR. ROSENBAUM:  Yes, but I would submit, your Honor,

6    yes, then it's just a fishing expedition.  In other words, that

7    would call into question the entire purpose for that 1782

8    application.  I mean, you can't just serve a subpoena on any

9    bank in any part of the world in a hope of turning something

10   up.  You have to have a good-faith basis to do it.  I think

11   it's only in that context that the Court can consider what was

12   meant by rank speculation at that time.

13        THE COURT:  Thank you, counsel.  Very helpful,

14   spirited argument on both sides.  I'll take this under

15   advisement.  In the first instance, we need to come to terms

16   with the issue involving the employee.  Kobre & Kim, I think

17   you need to give some hard, internal thought and discussion

18   with that employee just to make a judgment about what's best

19   for him and the firm.  In the short-term, if there isn't a

20   resolution reached, I will need what I sought from you.

21        All right.  Thank you, counsel.  We stand adjourned.

22                              * * *

23

24

25