20-3909-cv
*Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

────────────────

August Term, 2021

Argued: December 7, 2021    Decided: February 3, 2022
Amended: February 24, 2022

Docket No. 20-3909-cv

────────────────

THE FEDERAL REPUBLIC OF NIGERIA, ABUBAKAR MALAMI,
The Attorney General of the Federal Republic of Nigeria,

*Applicants-Appellants,*

— v. —

VR ADVISORY SERVICES, LTD., VR ADVISORY SERVICES (USA) LLC, VR CAPITAL
GROUP, LTD., VR GLOBAL ONSHORE FUND, L.P., VR ARGENTINA RECOVERY
ONSHORE FUND II, L.P., RICHARD DIETZ, JEFFREY JOHNSON, ASHOK RAJU,

*Respondents-Appellees.*

────────────────

B e f o r e :

LYNCH, CARNEY, and SULLIVAN, *Circuit Judges.*

────────────────

Applicants-Appellants the Federal Republic of Nigeria and its Attorney General (together, "Nigeria"), appeal an order of the United States District Court for the Southern District of New York (Engelmayer, *J.*) vacating its earlier grant of Nigeria's application for discovery from Respondents-Appellees pursuant to 28 U.S.C. § 1782. The district court considered Nigeria's use of § 1782 an improper attempt to "circumvent" the procedures set out in the Treaty Between the Government of the United States of America and the Federal Republic of Nigeria on Mutual Legal Assistance in Criminal Matters, U.S.-Nigeria, Sept. 13, 1989, T.I.A.S. No. 03-114.1 ("the MLAT"), for obtaining assistance from the United States Department of Justice in gathering evidence for use in criminal matters. The district court's ruling was based on an error of law. Nothing in the MLAT, § 1782, or any source of United States policy identified by the district court requires Nigeria to utilize the MLAT before or instead of § 1782.

Accordingly, we VACATE the judgment of the district court and REMAND for further consideration of the application.

———————

ALEXANDER D. PENCU, Meister Seelig & Fein LLP, New York, NY (Christopher J. Major and Austin D. Kim, *on the brief*), *for Applicants-Appellants.*

ZACHARY D. ROSENBAUM, Kobre & Kim LLP, New York, NY (Michael S. Kim, Josef M. Klazen, and Darryl G. Stein, *on the brief*), *for Respondents-Appellees.*

———————

GERARD E. LYNCH, *Circuit Judge*:

Applicants-Appellants the Federal Republic of Nigeria and its Attorney General, Abubakar Malami (together, "Nigeria"), appeal from a November 6, 2020 order of the United States District Court for the Southern District of New

York (Paul A. Engelmayer, *J.*) vacating its earlier *ex parte* grant of Nigeria's

application to compel discovery pursuant to 28 U.S.C. § 1782 from Respondents-

Appellees VR Advisory Services, Ltd. and related entities and officers (together,

"VR"). Section 1782 permits a district court, "pursuant to a letter rogatory issued,

or request made, by a foreign or international tribunal or upon the application of

any interested person," to compel discovery from a person within its jurisdiction

"for use in a proceeding in a foreign or international tribunal, including criminal

investigations conducted before formal accusation." Nigeria sought discovery

from VR for use in criminal proceedings in Nigeria related to the allegedly

fraudulent procurement of a public-utility contract. The district court initially

granted the application but later vacated that order, principally because it held

that Nigeria's application constituted an attempt to "circumvent" procedures laid

out in the Treaty Between the Government of the United States of America and

the Federal Republic of Nigeria on Mutual Legal Assistance in Criminal Matters,

U.S.-Nigeria, Sept. 13, 1989, T.I.A.S. No. 03-114.1 ("the United States-Nigeria

MLAT" or "the MLAT"), under which Nigeria could have sought assistance from

the United States Department of Justice.

We hold that the district court's decision was based on an error of law, and thus amounted to an abuse of discretion, because it effectively erected an impermissible "extra-statutory barrier[] to discovery" under § 1782. *In re Application of Gianoli Aldunate*, 3 F.3d 54, 59 (2d Cir. 1993). The United States-Nigeria MLAT by its plain terms does not restrict Nigeria's use of other lawful means to access evidence in the United States for use in criminal matters. To the contrary, it expands such access, supplementing rather than replacing other evidence-gathering tools such as § 1782. Nigeria therefore does not "circumvent" the MLAT by applying directly to the district court for discovery under § 1782. The district court further erred by concluding that Nigeria's potential use of the discovery materials sought in a related proceeding challenging an arbitration award before an English court would be "improper" and by considering such potential use as a negative factor in addressing Nigeria's § 1782 application.

We therefore VACATE the judgment of the district court and REMAND for further consideration of Nigeria's application.

4

## BACKGROUND

### I.     Factual Background

This case grows out of a contract dispute between Nigeria and Process & Industrial Developments, Ltd. ("P&ID"), a company in which VR holds a 25-percent ownership stake. P&ID was incorporated in the British Virgin Islands in 2006 by Martin Quinn, an Irish national and former music manager engaged in the Nigerian arms trade, and his associate Brendan Cahill, also an Irish national. At the time of its incorporation, P&ID had no assets and a small number of employees. Nevertheless, within a few years, it convinced a number of Nigerian businesspersons and government officials to help it secure a contract to construct a natural-gas processing plant in Nigeria.

That contract, the Gas Supply and Processing Agreement ("GSPA"), was signed in January 2010. Under its terms, P&ID would build a plant in Nigeria to process unrefined "wet gas" supplied by Nigeria into a product suitable for public-utility use and return much of the refined gas to Nigeria; P&ID would be entitled to keep the natural gas liquids stripped from the wet gas. The GSPA provided that legal disputes relating to the contract would be decided by an

arbitration panel in London applying Nigerian law. The agreement was to run for a term of 20 years.

For reasons that are in dispute, the GSPA fell through. Nigeria alleges that P&ID procured the GSPA by fraud and bribery, and never had any intention or ability to build a natural-gas plant. P&ID has alleged in other proceedings, and VR appears to take the position here, that P&ID secured funding and drew up plans for the plant, but that Nigeria breached the GSPA by refusing to help P&ID secure a source of wet gas.

VR, an international investment fund with offices in New York City, acquired a 25-percent ownership interest in P&ID in 2018. Nigeria now seeks discovery principally of documents that VR obtained from P&ID in the course of that acquisition.

## II.    Prior Proceedings

The dispute over the failed GSPA has spawned a decade of litigation spanning three continents. In addition to proceedings in the United States, the proceedings most relevant to the present appeal are an arbitration in England ("the Arbitration") in which P&ID secured a multi-billion-dollar award against Nigeria ("the Arbitration Award" or "the Award"); P&ID's attempt to enforce

6

that award in England and Nigeria's attempt to have the English court set the

Award aside ("the English Proceeding"); and criminal investigations and

prosecutions in Nigeria related to the GSPA and the Arbitration Award ("the

Nigerian Proceedings").

### A.    The Arbitration

P&ID initiated an arbitration in London in August 2012, alleging that

Nigeria had repudiated the GSPA by failing to make available wet gas as

required by its terms, and seeking $5,960,226,233 plus interest in damages for lost

profits. The arbitral tribunal held a liability hearing on June 1, 2015, by which

time Quinn had died and was thus unavailable to testify in person. At that

hearing, P&ID relied heavily on 34 pages of written testimony from Quinn, in

which he asserted that P&ID spent years and tens of millions of dollars on

preparatory work for the plant, such as drawing up plans and securing the

necessary permits, only to have Nigeria cut off communications and refuse to

help secure a source of wet gas as required by the GSPA. Nigeria called no

witnesses and presented only a single witness statement, which the tribunal

determined contained "no relevant evidence"; Nigeria would later allege that its

arbitration counsel, Olasupo Shasore, had a conflict of interest and worked to

7

undermine rather than advance Nigeria's defense. On July 17, 2015, the tribunal found Nigeria liable for breaching the GSPA by repudiation. On January 31, 2017, the tribunal awarded P&ID $6.6 billion in damages for 20 years of lost profits, plus seven percent interest.

### B.     The English Proceeding

On March 16, 2018, P&ID applied to the High Court of Justice, Queen's Bench Division, Commercial Court in London ("the English Court") for leave to enforce the Arbitration Award in the United Kingdom. The court granted P&ID leave to enforce the Award on September 26, 2019.

Soon thereafter, Nigeria sought to challenge the Arbitration Award. On December 5, 2019, Nigeria applied to the English Court for an extension of time to challenge the Award, alleging that it had uncovered evidence of fraud both in the inducement of the GSPA and in the procurement of the Award. On September 4, 2020, the English Court granted Nigeria's application for an extension of time to challenge the Award, holding – without making any definitive factual findings – that "Nigeria ha[d] established a strong prima facie case that the GSPA was procured by bribes paid to insiders as part of a larger scheme to defraud Nigeria" and that Quinn had perjured himself in his written

8

testimony, on which the arbitral tribunal had heavily relied. J. App'x at 366. The English Court has scheduled a trial on Nigeria's fraud claims for January 2023.

### C. The Nigerian Proceedings

Nigerian authorities began investigating P&ID and its procurement of the GSPA in February 2016. In 2019, after the English Court granted P&ID's application to enforce the Arbitration Award, Nigeria initiated a series of criminal prosecutions against P&ID and its affiliates. P&ID and P&ID Nigeria pleaded guilty to multiple counts, including conspiracy to defraud Nigeria, money laundering, tax evasion, and unauthorized trading. It is unclear whether any additional *prosecutions* remain pending in Nigeria related to the GSPA or the Arbitration Award, but Nigeria asserts that it is actively *investigating* criminal wrongdoing in connection with the Award.

### D. Prior Proceedings in the United States

#### 1. *P&ID's enforcement action in the District of Columbia*

In 2018, roughly contemporaneously with its enforcement action in England, P&ID brought an action in the United States District Court for the District of Columbia to enforce the Arbitration Award against Nigeria in the United States. *See Process and Industrial Developments Ltd. v. Fed. Republic of*

9

*Nigeria,* No. 18-cv-594, 2018 WL 8997443 (D.D.C. Oct. 1, 2018). Nigeria moved to dismiss the action for want of subject matter jurisdiction, arguing that the Foreign Sovereign Immunities Act ("FSIA") immunized it from even having to brief the merits of the case. *Id.* at *1. The district court (Christopher R. Cooper, *J.*) rejected that argument and set a briefing schedule. *Id.* at *2-3. The Court of Appeals for the District of Columbia Circuit reversed and remanded, however, holding that under the FSIA, the district court could not force a foreign sovereign to defend a case on the merits before ruling on a "colorable assertion[] of immunity." *Process and Industrial Developments Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020).

On remand, the district court again denied Nigeria's motion to dismiss, holding that Nigeria had implicitly waived its sovereign immunity by signing the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *Process and Industrial Developments Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 6-11 (D.D.C. 2020). Nigeria's interlocutory appeal of that order is now pending before the District of Columbia Circuit.

###### 2.  *Nigeria's first § 1782 application in New York*

On March 25, 2020, in the United States District Court for the Southern

District of New York, Nigeria applied under § 1782 to obtain discovery for use in

the Nigerian Proceedings from ten different banks that had done business with

P&ID. P&ID intervened in the matter, but it did not oppose the application;

rather, it asked the district court to grant it access to any evidence obtained

pursuant to the application and to limit the use of such evidence to the Nigerian

Proceedings, suggesting that Nigeria actually sought the requested discovery for

use in the English Proceeding. In its reply, Nigeria argued that P&ID lacked

standing as an "interested party" to seek access to the discovery materials, and

characterized P&ID's insinuation that Nigeria intended to use discovery

materials in the English Proceeding as "rank speculation":

> P&ID claims without support that it is an "interested
> party" but fails to articulate any cognizable interest it
> has in the Application, or present any reason why it
> should be provided with access to discovery materials
> produced by Bank Respondents. P&ID cites to its
> September 19, 2019 fraud conviction in Nigeria, but
> makes no claim that it has or will challenge this
> conviction, or that it plans to use documents produced
> by Bank Respondents in connection with any ongoing
> investigation or proceeding. Rather, P&ID believes it is
> entitled to discovery produced in these legal

11

> proceedings based on rank speculation that Applicants
> may seek to cite to documents produced by Bank
> Respondents "in other proceedings." P&ID's
> speculation is insufficient to transform P&ID into an
> interested party.

J. App'x at 275 (citation omitted). Importantly, Nigeria did not assert that it

would not use the discovery materials in the English Proceeding; indeed, it

argued in the same filing that it had every right to use any discovery the court

might order in other proceedings if it so chose. *See id.* at 276, quoting *In re Accent*

*Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) ("Section 1782 does not prevent

an applicant who lawfully has obtained discovery under the statute with respect

to one foreign proceeding from using the discovery elsewhere.").

On May 7, 2020, the district court (Lorna G. Schofield, *J.*) granted Nigeria's

§ 1782 application. Judge Schofield also granted P&ID's request to have

"reasonable access" to materials obtained pursuant to any subpoenas issued, but

did not restrict Nigeria's use of the evidence in the English Proceeding. Order, *In*

*re Ex Parte Application of the Fed. Republic of Nigeria*, No. 1:20-mc-00169, ECF No.

18, at 4 (S.D.N.Y. May 7, 2020).

As it turns out, Nigeria did, in fact, use evidence of alleged bribery in

connection with the GSPA that it obtained through that first § 1782 application to

12

make out its *prima facie* case of fraud in the English Proceeding. P&ID wrote to
Judge Schofield objecting to that use and to Nigeria's having allegedly obtained
materials outside the scope of the court's order, and it requested a protective
order (1) requiring Nigeria to destroy materials it obtained that were outside the
scope of discovery and (2) prohibiting Nigeria from using the materials it
obtained through § 1782 discovery in the English Proceeding. Judge Schofield
never ruled on the requested protective order. She did, however, grant a separate
request by JPMorgan Chase (one of the producing parties) for a protective order.
That order, to which both JPMorgan Chase and Nigeria stipulated, expressly
permitted Nigeria to use materials that JPMorgan Chase produced "in
proceedings arising out of or in connection with the Nigerian Proceedings, the
GSPA, the Award, or the attempted enforcement, confirmation, vacatur, or other
challenge of the Award." Stipulated Protective Order, *In re Ex Parte Application of
the Fed. Republic of Nigeria*, No. 1:20-mc-00169, ECF No. 26, at 3 (S.D.N.Y. July 10,
2020).

## III. The Present § 1782 Application

On May 12, 2020, five days after Judge Schofield granted Nigeria's first
§ 1782 application, Nigeria filed the present § 1782 application, also in the

Southern District of New York. This time, Nigeria sought discovery from VR Advisory Services, Ltd.; VR Advisory Services (USA) LLC; VR Capital Group, Ltd.; VR Global Onshore Fund, L.P.; VR Argentina Recovery Onshore Fund II, L.P.; and VR directors and officers Richard Dietz, Jeffrey Johnson, and Ashok Raju, "for use . . . in foreign criminal investigations and criminal judicial proceedings that are pending in the Federal Republic of Nigeria." J. App'x at 12.

Judge Engelmayer, to whom this second application was assigned, initially granted Nigeria's *ex parte* application and allowed it to subpoena the various VR respondents. Nigeria then served subpoenas requesting 56 categories of documents, including "[a]ll documents concerning the terms of VR Advisory's acquisition of Process & Industrial Developments, or any of its assets," "[a]ll documents and communications concerning the enforcement of any award granted in the Arbitration," and documents pertaining to transactions with various persons and entities involved in the GSPA affair. J. App'x at 136-42.

After those subpoenas were served, VR moved to quash them, to vacate the order granting the application, and to stay discovery. VR argued primarily that by seeking discovery under § 1782, Nigeria was attempting to circumvent the procedures of its MLAT with the United States, which allows Nigeria to enlist

14

the help of the United States Department of Justice to gather evidence for use in criminal proceedings. Nigeria argued in response that it did not have to use the procedures provided by the MLAT before seeking discovery for use in criminal matters under § 1782, and that in any event, "the arbitral enforcement proceeding in London is a related and independently qualifying foreign proceeding." Applicant's Opp'n Mot. Vac., *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, No. 1:20-mc-00209, ECF No. 25, at 4 (S.D.N.Y. July 10, 2020). Nigeria also argued that VR, as a private party, lacked standing to invoke a treaty between two sovereigns as a basis for vacating the grant of the application.

On November 6, 2020, the district court granted VR's motion to quash the subpoenas and vacate the earlier order granting the application. The court followed the prescribed two-step process for evaluating § 1782 applications: First, it considered the statutory requirements for discovery under § 1782, and second, it exercised its discretion to grant or deny the application, considering the four factors that the Supreme Court set out in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

Beginning with the statutory requirements, the district court determined that if Nigeria had sought discovery for use in the English Proceeding, the

15

application "would fail § 1782's second statutory requirement" – that discovery is sought for use in a proceeding before a foreign or international tribunal – because "[t]he pending English arbitral-enforcement proceeding" was of a "post-judgment character" akin to proceedings that this Court has held did not qualify under § 1782. *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 499 F. Supp. 3d 3, 10 (S.D.N.Y. 2020), citing *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 28 (2d Cir. 1998). Nevertheless, the district court "assume[d] arguendo" that the application sought documents for use in the Nigerian Proceedings, which it determined were qualifying proceedings under § 1782, and held that the other statutory requirements were satisfied. *Id.* at 11.

Proceeding to its discretionary balancing of the *Intel* factors, the court held that the first factor, whether "the person from whom discovery is sought is a participant in the foreign proceeding," *Intel*, 542 U.S. at 264, favored granting the application, but "only nominally . . . because P&ID – which is involved in the Nigerian criminal proceeding – is the likely source of documents held by [VR] relevant to that proceeding." *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 13. It held that the second factor, "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or

16

the court or agency abroad to U.S. federal-court judicial assistance," *Intel*, 542

U.S. at 264, favored granting the application, because the Nigerian government

was clearly receptive to, and in fact sought, the assistance in question, *Fed.*

*Republic of Nigeria*, 499 F. Supp. 3d at 13.

The district court held, however, that the third *Intel* factor, "whether the

§ 1782(a) request conceals an attempt to circumvent foreign proof-gathering

restrictions or other policies of a foreign country or the United States," *Intel*, 542

U.S. at 265, "merit[ed] the greatest weight" and "strongly counsel[ed] against

authorizing" the requested discovery. *Fed. Republic of Nigeria*, 499 F. Supp. 3d at

14. The court rejected Nigeria's argument that VR lacked standing to object to

Nigeria's use of § 1782 instead of the MLAT. *Id.* at 15. On the merits, although it

acknowledged that "there is no principle of law compelling a foreign nation

seeking evidence in this country for use in a criminal case to proceed first via an

MLAT," the district court determined that "there are sound reasons for generally

channeling such discovery applications through the MLAT process," including

the promotion of "comity and consistent outcomes," the protection of "domestic

entities" from "foreign prosecutors and criminal investigators," and the

assurance that "the U.S. government's expertise and analytic rigor is applied to

17

the application, including to assure that the discovery is not sought for ulterior (non-prosecutive) ends." *Id.* at 14. It explained that "[t]he U.S.-Nigeria MLAT [] puts in place a regular procedure for Nigeria to request assistance from the United States for discovery in Nigerian criminal cases" and maintained that Nigeria had not "provided a good reason for bypassing the MLAT process." *Id.* at 15. The court called it "plausible" that Nigeria was attempting "to avoid scrutiny by U.S. authorities into the integrity of their criminal proceedings, and to avoid scrutiny into whether Nigeria is seeking discovery from the VR entities for the improper purpose of attempting to undermine the arbitral Award issued against it," because Nigeria had "misled Judge Schofield" about its intentions with the discovery materials. *Id.* at 16.

Finally, the district court held that the fourth factor, whether the request was "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265, weighed against the application because "various document requests in the subpoena appear to sweep well beyond [the] subject" of bribery, which Nigeria was ostensibly investigating, possibly evincing an intent to use discovery materials "for purposes outside the contemplation of § 1782," *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 17.

18

Considering the four factors together, the district court vacated its earlier grant of Nigeria's application and quashed the subpoenas that Nigeria had already served pursuant to that grant. Nigeria filed a notice of appeal on November 17, 2020.

## DISCUSSION

### I.     Applicable Law

### A.     Section 1782

"We review de novo the district court's interpretation of the statutory requirements of § 1782." *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015). "We review the District Court's application of the so-called *Intel* factors and its decision to order discovery for abuse of discretion." *Fund for Protection of Investor Rights in Foreign States v. AlixPartners, LLP*, 5 F.4th 216, 224 (2d Cir. 2021).

> A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, "cannot be located within the range of permissible decisions."

*Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011), quoting *McDaniel v. County of Schenectady*, 595 F.3d 411, 416 (2d Cir. 2010).

19

"Section 1782 is the product of congressional efforts, over the span of
nearly 150 years, to provide federal-court assistance in gathering evidence for use
in foreign tribunals." *Intel*, 542 U.S. at 247. The present version of the statute, as
enacted in 1964 and amended in 1996, provides in relevant part:

> The district court of the district in which a person
> resides or is found may order him to give his testimony
> or statement or to produce a document or other thing
> for use in a proceeding in a foreign or international
> tribunal, including criminal investigations conducted
> before formal accusation. The order may be made
> pursuant to a letter rogatory issued, or request made, by
> a foreign or international tribunal or upon the
> application of any interested person and may direct that
> the testimony or statement be given, or the document or
> other thing be produced, before a person appointed by
> the court.

28 U.S.C. § 1782(a). The 1996 amendment added the phrase "including criminal
investigations conducted before formal accusation," thus expanding access to
discovery under § 1782 in criminal matters. *See* National Defense Authorization
Act for Fiscal Year 1996, Pub. L. No. 104-106, § 1342(b), 110 Stat. 186, 486. "To the
extent that the [district court's] order does not prescribe otherwise," discovery
pursuant to § 1782 is taken "in accordance with the Federal Rules of Civil
Procedure." 28 U.S.C. § 1782(a).

The analysis of a district court hearing an application for discovery

pursuant to § 1782 proceeds in two steps.

First, the court must determine whether the application satisfies § 1782's

three statutory requirements: that

> (1) the person from whom discovery is sought resides
> (or is found) in the district of the district court to which
> the application is made, (2) the discovery is for use in a
> foreign proceeding before a foreign [or international]
> tribunal, and (3) the application is made by a foreign or
> international tribunal or any interested person.

*Mees*, 793 F.3d at 297, quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673

F.3d 76, 80 (2d Cir. 2012) (alteration in original). We have held that in order to

satisfy the second statutory requirement, the applicant must seek discovery for

use in an "adjudicative" proceeding. *See In re Letters Rogatory Issued by Dir. of*

*Inspection of Gov't of India* ("*India*"), 385 F.2d 1017, 1020-22 (2d Cir. 1967) (Friendly,

J.) (holding that assessment by an Indian tax official was not a "proceeding in a

foreign or international tribunal" because of the official's essentially executive,

rather than adjudicative, function).

Second, if the district court has determined that the statutory requirements

are met, it "may grant discovery under § 1782 in its discretion . . . 'in light of the

twin aims of the statute: providing efficient means of assistance to participants in

international litigation in our federal courts and encouraging foreign countries by

21

example to provide similar means of assistance to our courts.'" *Mees*, 793 F.3d at

297-98, quoting *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d

Cir. 2004). To evaluate whether granting an application would further those aims,

courts are to consider four factors that the Supreme Court laid out in *Intel*:

> (1) whether "the person from whom discovery is sought
> is a participant in the foreign proceeding," in which case
> "the need for § 1782(a) aid generally is not as apparent";
> (2) "the nature of the foreign tribunal, the character of
> the proceedings underway abroad, and the receptivity
> of the foreign government or the court or agency abroad
> to U.S. federal-court judicial assistance"; (3) "whether
> the § 1782(a) request conceals an attempt to circumvent
> foreign proof-gathering restrictions or other policies of a
> foreign country or the United States"; and (4) whether
> the request is "unduly intrusive or burdensome."

*Mees*, 793 F.3d at 298, quoting *Intel*, 542 U.S. at 264-65.

While the ultimate decision to grant or deny an application is

discretionary, we have cautioned that courts are "not free to read extra-statutory

barriers to discovery into section 1782" under the guise of exercising their

discretion. *Gianoli Aldunate*, 3 F.3d at 59; *see also In re Malev Hungarian Airlines*,

964 F.2d 97, 100 (2d Cir. 1992) ("[D]istrict courts issuing discovery orders

pursuant to 28 U.S.C. § 1782 may impose conditions to minimize the compliance

burdens, so long as those conditions do not impose extra-statutory barriers to

obtaining discovery such as an exhaustion requirement.").

### B.   The United States-Nigeria MLAT

"We review *de novo* a district court's interpretation of a treaty." *Swarna v. Al-Awadi*, 622 F.3d 123, 132 (2d Cir. 2010).

An MLAT is an agreement between two sovereigns to provide assistance in criminal matters where evidence, persons, or property potentially useful to one sovereign's prosecutors may be found within the other's jurisdiction. Nigeria is one of many countries that have an MLAT with the United States. The United States and Nigeria signed their MLAT on September 13, 1989. The Senate approved the treaty on October 18, 2000, the president signed it into law on January 5, 2001, and it took effect on January 14, 2003.

The preamble to the United States-Nigeria MLAT states that its purposes are "to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters," "[c]onsidering in particular the need to fight against illicit production of and trafficking in narcotic drugs and other controlled substances," and "to enhance assistance in the fight against crime."

23

Article I lays out the treaty's basic functions. The two sovereigns "shall, upon request and in accordance with the provisions of th[e] Treaty, provide mutual assistance in connection with the investigation, prosecution, and prevention of crimes, and in proceedings related to criminal matters." United States-Nigeria MLAT, art. I, ¶ 1. The types of assistance available include:

> (a) taking the testimony or statements of persons;
> (b) providing documents, records, and articles of evidence;
> (c) serving documents;
> (d) locating and identifying persons;
> (e) transferring persons in custody for testimony or other purposes;
> (f) executing requests for searches and seizures;
> (g) tracing, identifying, and immobilizing criminally obtained assets;
> (h) assisting in proceedings related to forfeiture, restitution, and collection of fines; and
> (i) any other form of assistance not prohibited by the laws of the Requested State.

*Id.* art. I, ¶ 2. The conduct being investigated in the Requesting State need not be a crime under the laws of the Requested State, and the treaty states that it "is intended solely for mutual legal assistance" between the two sovereigns, expressly disclaiming the creation of any "right on the part of any private party to obtain, suppress, or exclude any evidence, or to impede the execution of a request." *Id.* art. I, ¶¶ 3-4.

24

Articles II and IV-VII lay out the procedures by which the Requesting State requests, and the Requested State grants or denies, assistance. Under Article II, each country has a "Central Authority" that handles MLAT requests: "the Attorney General or a person designated by him" for the United States, and "the Attorney General of the Federation or a person designated by him" for Nigeria. *Id.* art. II, ¶¶ 1-2. Thus, in this country, the Department of Justice processes MLAT requests. Articles IV-VII concern various technical aspects of the procedures for requesting assistance and processing such requests.

Articles III and VIII place substantive limitations on the content of requests and the use of materials obtained, respectively. "The Central Authority of the Requested State may deny assistance" if

> (a) a request is not in compliance with the provisions of th[e] Treaty;
> (b) the request relates to a political offense;
> (c) the request relates to an offense under military law which would not be an offense under ordinary criminal law; or
> (d) the execution of the request would be contrary to the Constitution of the Requested State or would prejudice the security or other essential national interests of that State.

*Id.* art. III, ¶ 1. "The Requesting State shall not use any information or evidence obtained under th[e] Treaty in any investigation, prosecution, or proceeding

25

other than that described in the request without the prior consent of the

Requested State," unless the information or evidence has already become public.

*Id.* art. VIII, ¶¶ 1-2.

Article XIX provides a rule of construction that is directly relevant to the

present case:

> Assistance and procedures provided by this Treaty shall
> not prevent or restrict either of the Contracting Parties
> from granting any assistance under other applicable
> international conventions, arrangements, agreements,
> practices, or under the laws of the Contracting Parties.

*Id.* art. XIX. In its report recommending approval of the treaty, the Senate Foreign

Affairs Committee explained that Article XIX "provides that the Treaty shall not

be deemed to prevent recourse to any assistance available under the internal laws

of either country," "leaves the provisions of United States and Nigerian law on

letters rogatory completely undisturbed, and does not alter any pre-existing

agreements concerning investigative assistance." S. Exec. Rep. No. 106-24, at 102

(Oct. 4, 2000).

Prior to 2009, the Department of Justice utilized the procedures made

available by § 1782 when a foreign sovereign submitted an MLAT request that

required court authorization in the United States. *See, e.g., In re Erato*, 2 F.3d 11

26

(2d Cir. 1993) (discussing various issues arising from a district court appointment of an Assistant U.S. Attorney as a commissioner under § 1782 to execute an MLAT request from the Netherlands). In 2009, Congress codified and streamlined that practice, which had developed through decades of case law, "mak[ing] it easier for the United States to respond to these requests by allowing them to be centralized and by putting the process for handling them within a clear statutory system." 155 Cong. Rec. S6810 (daily ed. June 18, 2009) (statement of Sen. Whitehouse). The new statute made explicit what courts had long held was authorized under § 1782 – for example, that a federal judge may order "the appearance of a person for the purpose of providing testimony or a statement, or requiring the production of documents or other things," 18 U.S.C. § 3512(a)(2)(D), or appoint a person to direct the taking of testimony or the production of documents, *id.* § 3512(b)(1). Notably, that statute does not "preclude any foreign authority or an interested person from obtaining assistance in a criminal investigation or prosecution pursuant to section 1782 of title 28, United States Code." *Id.* § 3512(g).

## II.     The Present Application

In this case, the district court held or assumed *arguendo* that all three

27

statutory requirements of § 1782 were satisfied, and it based its decision to vacate its earlier grant of discovery primarily on the third *Intel* factor and, to a lesser extent, the fourth. Specifically, the district court held that Nigeria's § 1782 request concealed an attempt to "circumvent" the United States-Nigeria MLAT, and that the request was unduly burdensome, at least in part because some of the materials were likely relevant only to the English Proceeding. Sp. App'x at 25. We address the district court's weighing of the third and fourth *Intel* factors in turn, interpreting the United States-Nigeria MLAT as necessary.

### A.     The Third *Intel* Factor

The district court gave the greatest weight, and Nigeria devotes the bulk of its argument, to the third *Intel* factor – "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Nigeria argues that the district court erred (1) by allowing VR to raise the MLAT issue, (2) by effectively erecting an extra-statutory requirement that a country with an MLAT pursue an MLAT request before (or instead of) seeking discovery under § 1782 for use in a criminal matter, and (3) by treating Nigeria's potential use of discovery materials in the English Proceeding as relevant to the analysis of the

28

third *Intel* factor. We conclude that Nigeria's first argument lacks merit but that its second and third are correct.

### 1.    *VR did not lack standing to raise the MLAT issue.*

Nigeria first argues that the district court erred in rejecting its standing argument and allowing VR to raise the MLAT issue as a reason to vacate the earlier grant of discovery. We disagree.

Ordinarily, "absent protest or objection by the offended sovereign, an individual has no standing to raise the violation of international law," including treaties, "as an issue," unless the treaty creates "privately enforceable rights" or gives "some other indication that the intent of the treaty drafters was to confer rights that could be vindicated in the manner sought by affected individuals." *Georges v. United Nations*, 834 F.3d 88, 97 (2d Cir. 2016) (alterations, citations, and internal quotation marks omitted).

That rule, however, concerns attempts by private parties to assert private *rights* under treaties. In *United States v. Davis*, 767 F.2d 1025 (2d Cir. 1985), for example, we held that a criminal defendant was not entitled to have evidence against him excluded simply because it was gathered pursuant to an MLAT request to Switzerland that did not comply with the procedures contemplated by

29

the United States-Switzerland MLAT, which expressly disclaimed the creation of private rights. *Id.* at 1029-31; *see also Georges*, 834 F.3d at 97-98 (holding that treaty created no private right to pierce United Nations' immunity where United Nations committed "material breach" of treaty); *In re United Kingdom*, 685 F.3d 1, 13-15 (1st Cir. 2012) (holding that United States-United Kingdom MLAT did not create private right for targets of MLAT requests to move to quash subpoenas on grounds that requests did not comply with procedures outlined in treaty).

Here, Nigeria makes a different kind of argument: that VR lacked standing even to point to the United States-Nigeria MLAT as a factor that might be relevant to the district court's discretionary evaluation of the third *Intel* factor. It is true that Article I, ¶ 4 of the United States-Nigeria MLAT expressly disclaims the creation of rights in "any private party to obtain, suppress, or exclude any evidence, or to impede the execution of a request."

Nigeria's standing argument, however, misapprehends the rule against private invocation of treaty rights. In raising the MLAT issue, VR was neither arguing that the MLAT conferred any rights on it nor seeking to assert such rights. Rather, it was appealing to the district court's discretion to deny discovery on grounds that Nigeria was attempting to "circumvent" proof-gathering

30

restrictions or policies of the United States or Nigeria, a factor that the Supreme Court has instructed district courts to consider. The text of the MLAT itself supports that distinction. By pointing to the MLAT as a factor to be considered, VR is not asserting any right to "obtain, suppress or exclude" evidence by invoking the MLAT, nor to impede the execution of an MLAT request. United States-Nigeria MLAT, art. I, ¶ 4. The third *Intel* factor concerns efforts to evade "foreign proof-gathering restrictions or other policies of a foreign country or of the United States." *Intel*, 542 U.S. at 265. If indeed the United States-Nigeria MLAT embodied a relevant proof-gathering restriction or policy of the United States or Nigeria, the district court would be entitled to consider that restriction or policy, regardless of whether the MLAT conferred any "rights" on VR. The district court thus did not err in allowing VR to raise the MLAT issue. We turn, therefore, to the merits of the district court's evaluation of the third *Intel* factor.

2.      *As a matter of law, Nigeria's request does not "circumvent" the MLAT.*

Nigeria next argues that in holding that its application concealed an attempt to "circumvent" the United States-Nigeria MLAT, the district court committed a legal error and effectively erected an impermissible "extra-statutory barrier[]" to discovery. *Gianoli Aldunate*, 3 F.3d at 59. We agree.

31

As an initial matter, we are not persuaded by VR's argument that what the MLAT requires by its terms is not dispositive of this appeal because the district court was exercising its discretion rather than purporting to definitively interpret the treaty. To be sure, the district court acknowledged that "there is no principle of law compelling a foreign nation seeking evidence in this country for use in a criminal case to proceed first via an MLAT," and it buttressed its analysis with policy reasons for preferring MLAT requests to § 1782 requests by foreign sovereigns for use in criminal matters. *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 14. But whether the United States-Nigeria MLAT embodies a "proof-gathering restriction[] or other polic[y] of [Nigeria] or the United States" that one can "circumvent" within the meaning of *Intel*, 542 U.S. at 265, is a question of law, not discretion, and a district court abuses its discretion where it "bases its decision on an error of law," *Millea*, 658 F.3d at 166. To answer that question, we must consider the terms of the MLAT, particularly where, as here, VR points to no other sources of United States policy aside from the treaty itself.

To date, neither the Supreme Court nor any Court of Appeals has considered whether a foreign sovereign that has an MLAT with the United States "circumvents" that MLAT by filing a § 1782 application in the district court.

Besides the district court in the instant case, three district courts have considered

that question, all of them in different Circuits – one in relation to the United

States-Nigeria MLAT and two in relation to a similar MLAT between the United

States and Turkey – and all have denied the applications before them principally

on the same basis as the district court in this case. *See generally In re Ekpenyong*

*Ntekim*, No. 1:13-mc-38, Sp. App'x at 24-26 (E.D. Va. Dec. 18, 2013) (unpublished

opinion); *In re Republic of Turkey*, No. 2:20-mc-36, 2021 WL 671518 (S.D. Ohio Feb.

22, 2021) ("*Republic of Turkey I*"); *In re Republic of Turkey*, No. 20-C-5012, 2021 WL

3022318 (N.D. Ill. July 16, 2021) ("*Republic of Turkey II*"). The first district court,

however, devoted a mere three sentences of analysis to the circumvention

question, *see Ekpenyong Ntekim*, Sp. App'x at 25-26,[1] and the other two relied on

---

[1] The entirety of that district court's reasoning regarding the MLAT was as follows:

> This request, from the Attorney General of Akwa Ibom State to the U.S. District Court for the Eastern District of Virginia, would circumvent the procedure that the Government of the United States and the Government of the Federal Republic of Nigeria have established to facilitate precisely this type of request. Thus, the facts of this case point persuasively to [*sic*] conclusion that applicant's request should properly be handled by the United States executive branch through diplomatic means. As such, it is appropriate for applicant to direct

the reasoning of the district court in this case, *see Republic of Turkey I*, 2021 WL 671518, at *8-12; *Republic of Turkey II*, 2021 WL 3022318, at *6-7. With no binding authority on point and little original analysis in the scant persuasive authority that exists, we must consider for ourselves the import of the Supreme Court's guidance in *Intel* and the meaning of the United States-Nigeria MLAT.

We begin with the word "circumvent," the focus of the third *Intel* factor. Something that is "circumvented" must be an obstacle that one ordinarily would expect to encounter. *See* Circumvent, Oxford English Dictionary (2021) ("To get the better of by craft or fraud; to overreach, outwit, cheat, 'get round', 'take in'. Also, to evade or find a way around (a difficulty, obstacle, etc.)."); Circumvent, Black's Law Dictionary (11th ed. 2019) ("To avoid (a restrictive problem, rule, etc.), esp. by clever and sometimes dishonest means . . . . To avoid (an obstacle, etc.) by changing route."). If there are two equally valid means to the same end and neither is meant to restrict use of the other, the choice of one over the other is not "circumvention." For example, if two trains run from Lagos to Abuja but one makes fewer stops along the way and therefore completes the journey in less

---

his request to the relevant U.S. authorities designated under the Treaty.

time, a passenger who chooses the faster express train has not "circumvented" the slower local.

In the context of § 1782 and the third *Intel* factor, circumvention occurs where the applicant uses a § 1782 application to avoid measures that are *intended* to restrict certain means of gathering or using evidence. In *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238 (2d Cir. 2018), for example, we held that the district court abused its discretion in granting a § 1782 application, in part because the applicant, who was engaged in litigation in the Netherlands, was attempting to gather evidence in the United States that it would not be able to obtain under the more restrictive Dutch discovery rules. *Id.* at 245. Indeed, we have cautioned that courts should not give undue weight to the mere absence in foreign jurisdictions of proof-gathering *mechanisms* available in the United States, for "'[p]roof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that fail to *facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Mees*, 793 F.3d at 303 n.20 (emphasis in original). In order to tell whether an application like Nigeria's can, as a matter of law, be said to "circumvent" the United

States-Nigeria MLAT within the meaning of *Intel*, we must determine whether the MLAT is properly understood as embodying a proof-gathering restriction, or at least a policy *preference* for use of its processes over other means by which Nigeria can gather evidence in the United States for use in criminal matters.

"When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used." *Cohen v. American Airlines, Inc.*, 13 F.4th 240, 245 (2d Cir. 2021), quoting *Ehrlich v. American Airlines, Inc.*, 360 F.3d 366, 375 (2d Cir. 2004) (internal quotation marks omitted). The text of the MLAT makes clear that it was intended to expand, not contract, each signatory's access to criminal evidence in the other's jurisdiction. Article XIX of the treaty provides that "[a]ssistance and procedures provided by this Treaty shall not prevent or restrict either of the Contracting Parties from granting any assistance under other applicable international conventions, arrangements, agreements, practices, or under the laws of the Contracting Parties."

That provision alone should end the matter. Section 1782 is, of course, a law of the United States, one of the Contracting Parties, and it was in place at the time the treaty was signed and entered into force. The text of the MLAT makes plain that it does not operate as a restriction on evidence-gathering by means of

such an existing law.[2] The preamble to the treaty further supports that construction: It explains that the treaty's purposes are "to *improve* the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters" and "to *enhance* assistance in the fight against crime." (Emphasis added.) A treaty could hardly be said to "improve" or "enhance" the capabilities of law enforcement authorities if it deprived them of tools previously at their disposal.[3]

To be sure, parts of the United States-Nigeria MLAT do impose limits on the assistance that the Department of Justice or Nigerian Attorney General will

---

[2] At oral argument, VR argued for the first time that in the phrase "[a]ssistance and procedures provided by this Treaty," United States-Nigeria MLAT, art. XIX, the word "and" should be read conjunctively and "provided" in the past tense, and therefore Article XIX only applies where the Requesting State has already sought and obtained the assistance of the Requested State under the procedures outlined in the treaty. That belated argument mangles the plain language of the treaty. The phrase "provided *by* this Treaty" makes clear that "this Treaty" – not the Requested State's Central Authority – is doing the "provid[ing]."

[3] The text of the treaty is clear enough, standing alone, to resolve the issue before us. We note, nevertheless, that the legislative history is fully consistent with our reading of the text. Mirroring the text, the Senate Foreign Affairs Committee noted its understanding that Article XIX is intended to make clear that the MLAT "shall not be deemed to prevent recourse to any assistance available under the internal laws of either country." S. Exec. Rep. No. 106-24, at 102.

provide in response to an MLAT request. Article III, ¶ 1, for instance, authorizes the relevant authorities to deny requests that are noncompliant with the provisions of the treaty, relate to political offenses, relate to conduct that is only criminal under military law, or would violate the Requested State's constitution or endanger its essential national interests. In addition, Article VIII imposes restrictions on the use of assistance obtained through MLAT requests. But reading those limiting provisions together with Article XIX's rule of construction, it is clear that they are intended only as internal limits applicable to MLAT requests, not as restrictions on proof-gathering means external to the treaty.

Reading the treaty's procedures and substantive limitations as purely internal not only comports with the clear commands of the text – it also makes eminent sense. An MLAT is not merely a means by which a foreign sovereign may gather evidence in another jurisdiction. It is a cooperative arrangement pursuant to which the Requested State's executive authorities affirmatively provide *assistance* to the Requesting State's executive authorities. Under the United States-Nigeria MLAT, the Department of Justice is obligated to assist the Nigerian authorities by means that would be unavailable in the United States to private persons or to the Nigerian authorities acting alone, even with access to

§ 1782. These include, among other means of assistance: "transferring persons in custody for testimony or other purposes; [] executing requests for searches and seizures; [] tracing, identifying, and immobilizing criminally obtained assets; [and] assisting in proceedings related to forfeiture, restitution, and collection of fines." United States-Nigeria MLAT, art. I, ¶ 2. It is hardly surprising that there should be sharper limits on borrowing the power of the Department of Justice and its law enforcement partners than on making the sorts of ordinary discovery requests available to every civil litigant in a United States District Court. It similarly makes sense that those sharper limits would apply to requests by American prosecutors for assistance by the Nigerian authorities.

For similar reasons, we are unpersuaded by VR's policy argument that opening the § 1782 process to foreign sovereigns investigating criminal offenses would deter other countries from entering MLATs with the United States. An MLAT offers a foreign sovereign many forms of assistance that are not available via the ordinary civil discovery procedures available under § 1782, such as the ability to execute (through the Department of Justice) searches and seizures in this country. That alone, not to mention the other tools that an MLAT provides, is a significant incentive for other countries to negotiate MLATs with the United

States. Moreover, regardless of the possible soundness of its policy arguments, VR does not point to any principle of law that would prevent a sovereign, with or without an MLAT with the United States, from obtaining discovery in a criminal matter by means of a direct § 1782 application. If anything, it is VR's position – that an MLAT should be considered an obstacle to a foreign sovereign seeking discovery pursuant to § 1782 for use in criminal matters – that would disincentivize the further proliferation of MLATs.

Nor do the policy reasons that the district court identified justify an insistence on first resort to the MLAT process. While district courts have broad discretion to grant or deny § 1782 applications, that discretion is not a license to engage in a free-ranging policy analysis of any given application without a basis in the *Intel* factors or the broader "twin aims" of the statute. *See Malev Hungarian Airlines*, 964 F.2d at 100-01, quoting *Indep. Oil & Chem. Workers v. Procter & Gamble*, 864 F.2d 927, 929 (1st Cir. 1988) ("Judicial discretion is necessarily broad – but it is not absolute. Abuse occurs . . . where an improper factor is relied upon . . . ."). Thus, in *Malev Hungarian Airlines*, we held that a district court abused its discretion by denying an application on the basis that the applicant had not exhausted its opportunities for discovery before the foreign tribunal – a

40

requirement that, while perhaps supported by sound policy considerations, has

no basis in the text or purpose of § 1782. *Id.* at 101.

The district court may well be correct that the MLAT process

> promotes comity and consistent outcomes . . . , adds
> protection for the domestic entities from whom
> discovery is sought by foreign prosecutors and criminal
> investigators, and assures that the U.S. government's
> expertise and analytic rigor is applied to the application,
> including to assure that the discovery is not sought for
> ulterior (non-prosecutive) ends.

*Fed. Republic of Nigeria*, 499 F. Supp. 3d at 15. It may also be that foreign

sovereigns and prosecutors – both those with an MLAT and those without –

often send their evidence-gathering requests to the Department of Justice instead

of making applications under § 1782.[4] But consistency, protection of domestic

entities, and reliance on executive expertise are not relevant considerations when

---

[4] The district court suggested that channeling requests through the Department of Justice is the most common procedure – at least where an MLAT exists – but it did not cite any empirical data comparing the respective frequency of use of these alternate procedures. *See Fed. Republic of Nigeria*, 499 F. Supp. 3d at 15 ("[B]ased on the authorities the parties have mustered, other foreign prosecutors appear to have consistently pursued discovery via the governing MLAT rather than proceeding in the first instance to a district court under § 1782."). In any event, the existence of a general *practice* among foreign sovereigns, standing alone, neither establishes a United States or foreign *policy* preferring the use of MLATs nor provides an independent reason to deny an MLAT signatory's § 1782 application.

evaluating the third or any other *Intel* factor. And while the promotion of comity

may be relevant to the overarching inquiry of whether granting the application

would serve the second of the "twin aims" of § 1782 – "encouraging foreign

countries by example to provide similar means of assistance to our courts," *Mees*,

793 F.3d at 297-98, quoting *Schmitz*, 376 F.3d at 84 – the district court did not

explain why allowing foreign sovereigns to make direct § 1782 requests for

discovery in criminal matters would undermine that aim. To the extent that

§ 1782 forces district courts to make determinations that they might consider

other actors better equipped to make, "we are not at liberty to second-guess the

policy choices of our Congress." *Malev Hungarian Airlines*, 964 F.2d at 100.

Moreover, insofar as Congress has set *any* policy regarding foreign

requests for assistance in criminal matters – with or without an MLAT[5] – that

---

[5] At oral argument, VR's counsel asserted that it is standard procedure for
countries without an MLAT seeking assistance in criminal matters to send letters
rogatory to the Department of Justice. When pressed, however, VR's counsel
could not provide any empirical basis for that assertion besides the fact that the
Department *has procedures* for processing letters rogatory from such countries –
an apparent reference to outdated Department guidance cited in VR's brief.
Whatever the Department's procedures for processing letters rogatory may be
after the enactment of 18 U.S.C. § 3512 in 2009, the existence of such an option
does not imply a relevant policy preference on behalf of the United States. There
is no requirement in the text of § 1782 that foreign sovereigns and prosecutors
proceed by letters rogatory directed to the Executive Branch rather than by direct

policy is that § 1782 applications should remain an option for the foreign

sovereign. When Congress codified the process for granting orders authorizing

the Justice Department to provide assistance to a foreign sovereign, *see* 18 U.S.C.

§ 3512, it expressly provided that "[n]othing in [that] section shall be construed to

preclude any foreign authority or an interested person from obtaining assistance

in a criminal investigation or prosecution pursuant to section 1782 of title 28,

United States Code." *Id*. § 3512(g). It is of course possible that a specific treaty

could enact a policy that would trump that more general provision, but neither

VR nor the district court identifies any reason why the United States-Nigeria

MLAT should be read to do so.

 In sum, the United States-Nigeria MLAT does not, as a matter of law,

embody a "proof-gathering restriction[] or [] polic[y]" that prefers its own

procedures above other means of gathering evidence for use in criminal matters.

*Intel*, 542 U.S. at 265. Nigeria does not "circumvent" any relevant restriction or

policy within the meaning of *Intel* by filing an application under § 1782 when it

---

applications to courts under § 1782. To the contrary, the statute mentions letters
rogatory as an option only where a foreign or international *tribunal* seeks
assistance. *See* 28 U.S.C. § 1782(a) ("The order may be made pursuant to [1] a
letter rogatory issued, or request made, by a foreign or international tribunal or
[2] upon the application of any interested person . . . .").

could otherwise file an MLAT request. We therefore hold that the district court based its decision on legal error, and thereby exceeded the bounds of its discretion, by requiring Nigeria to justify its use of a § 1782 application rather than an MLAT request for discovery in connection with criminal proceedings.

3. *It would not be "improper" for Nigeria to use the materials sought in the English Proceeding.*

Nigeria further argues that the district court erred in considering its potential use of evidence gathered pursuant to its § 1782 application in the English Proceeding, and its representations to Judge Schofield on that subject, when deciding the question of "circumvention" within the meaning of the third *Intel* factor. Again, we agree.

In evaluating the statutory requirements of § 1782, the district court stated that the English Proceeding was not a "proceeding before a foreign or international tribunal" within the meaning of the statute. *See Fed. Republic of Nigeria*, 499 F. Supp. 3d at 10-11. The present application names the Nigerian Proceedings – which the district court was willing to assume were qualifying proceedings – as the matter for which Nigeria seeks discovery. Thus the district court's discussion of the English Proceeding in the context of the second statutory

44

requirement is arguably dictum. However, the district court also relied on its characterization of the English Proceeding as beyond the scope of the statute in its evaluation of the third *Intel* factor, viewing Nigeria's potential use of evidence gathered pursuant to its § 1782 application in that proceeding as evidence of Nigeria's intent to "circumvent" proof-gathering restrictions or policies. *See id.* at 17 ("[T]he Court finds that the DOJ review contemplated by the MLAT would serve salutary purposes here, including helping determine whether, in whole or in part, the materials sought are genuinely intended for use in a criminal prosecution or investigation, or whether they are sought for the *improper purpose* of fortifying Nigeria's attempt in the English courts to void the multi-billion-dollar arbitral Award against it." (emphasis added)). We therefore have occasion to note that there would be nothing "improper" about Nigeria's use of discovery gathered pursuant to the instant application in the English Proceeding.

From the record before us, it appears that the English Proceeding would independently qualify as a "proceeding in a foreign or international tribunal" within the meaning of the statute. In concluding that it did not, the district court relied principally upon *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998). In that case, the applicant initially sought discovery for use in a civil fraud

45

action in France. *Euromepa,* 154 F.3d at 25. While the application was pending,

however, the French trial court entered judgment for the plaintiff (the respondent

in this country), and France's court of last resort for the matter affirmed that

judgment. *Id.* at 25-26. The defendant (the applicant in this country) then declared

bankruptcy in France. *Id.* at 26. The respondent moved in the district court to

dismiss the § 1782 application as moot, asserting that the matter for which

discovery was sought had run its course; the applicant argued in response that

the still-ongoing bankruptcy proceeding was a qualifying "proceeding" within

the meaning of § 1782. *Id.* at 28. The district court dismissed the application as

moot, and we affirmed. Although we acknowledged that "a bankruptcy

proceeding may, in some instances, be an adjudicative proceeding within the

meaning of the statute," we noted that "[a]s a matter of French law, the judgment

of the French Supreme Court acts as *res judicata* with respect to the merits of the

dispute in the French Bankruptcy Proceeding." *Id.* Therefore, "in the French

Bankruptcy Proceeding, nothing [was] being adjudicated; the already extant

judgment [was] merely being enforced." *Id.*

    Contrary to the district court's reasoning in the present case, the English

Proceeding is not "of a similar post-judgment character" to the French

46

bankruptcy proceeding in *Euromepa*. *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 10. True, there is something resembling an "already extant judgment" here – the Arbitration Award – and Nigeria is attempting to keep that Award from being "enforced" in the English Proceeding. *Euromepa*, 154 F.3d at 28. But the district court misread *Euromepa* to the extent that it understood that case to hold that the mere completion of an initial adjudication of a dispute categorically disqualifies a foreign proceeding under § 1782's statutory "proceeding" requirement. *Euromepa* was fundamentally a case about mootness, at least in the practical sense. We held that there was no longer a qualifying "proceeding" under the statute because the French equivalent of our *res judicata* doctrine prevented the French bankruptcy court from reconsidering the underlying merits of the dispute, and thus the discovery sought in the United States was no longer of any use in the matter for which it was originally sought.

Here, in contrast, Nigeria is expressly asking the English Court to probe the merits of, and set aside, the Arbitration Award, and VR has never disputed that the English Court has the authority to do so. The English Court, unquestionably a foreign tribunal, has scheduled a trial, a quintessential adjudicative proceeding, to determine the merits of a contention that an arbitral

47

award should be vacated as fraudulently obtained, a recognized judicial function

in this country as well as in the United Kingdom. *Cf. India*, 385 F.2d at 1020-22

(explaining that "an Indian Income-Tax Office is not a 'tribunal'" and its tax-

collection efforts are not adjudicative proceedings). We have no doubt, therefore,

that if Nigeria had sought to obtain discovery under § 1782 in the first instance

for use in the English Proceeding, such a request would satisfy the statutory

requirements.

Of course, Nigeria did not state in the present application that it sought

discovery for use in the English Proceeding – it stated that it sought discovery for

use in the Nigerian Proceedings. But we have held that "Section 1782 does not

prevent an applicant who lawfully has obtained discovery under the statute with

respect to one foreign proceeding from using the discovery elsewhere." *Accent

Delight*, 869 F.3d at 135. While that holding concerned the statutory "for use"

requirement, it necessarily follows that the possibility of use in a different but

independently qualifying proceeding does not constitute an attempt to

"circumvent" a proof-gathering restriction or policy of the United States or a

foreign state. The district court thus erred to the extent that its evaluation of the

third *Intel* factor relied on its characterization of the English Proceeding as an

"improper" use for discovery obtained pursuant to the present application.

For the same reason, the district court's concern about Nigeria's representations to Judge Schofield was misplaced. Nigeria asserts that the district court's characterization of those representations as "dishonest" was clearly erroneous. We need not decide that question, because the district court considered Nigeria's putative dishonesty to Judge Schofield relevant only insofar as it evinced an intent "to avoid [Department of Justice] scrutiny into whether Nigeria is seeking discovery from the VR entities for the improper purpose of attempting to undermine the arbitral Award against it," *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 16, which, as just discussed, would not be an improper purpose. Regardless of whether Nigeria "misled" Judge Schofield regarding its intentions, the district court's reasoning as to why any putative dishonesty would be relevant to its analysis of the third *Intel* factor relied on legal error, strengthening our conclusion that the district court abused its discretion in evaluating the third *Intel* factor.[6]

---

[6] That is not to say that if a district court determines that the stated reasons underlying a § 1782 application were purely pretextual, that fact should be irrelevant to the court's consideration of the application. At the same time, we note that VR's description of the district court's concern in this case appears somewhat exaggerated. Nigeria's dismissal of VR's suggestion that it was

49

## B.    The Fourth *Intel* Factor

Finally, Nigeria argues that the district court abused its discretion in determining that the fourth *Intel* factor – whether the discovery request is "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265 – weighed against the application. We agree to the extent that the district court's evaluation of the fourth factor relied on the possibility that Nigeria would use the materials it obtained in the English Proceeding.

The district court concluded that the fourth factor weighed against the application for two reasons: (1) because "various document requests in the subpoena appear to sweep well beyond [the] subject" of "bribery in connection with procuring the [Arbitration] Award;" and (2) because "the breadth of the requests for materials relating to the arbitration and its enforcement may reflect

---

interested in using the documents it sought in the English proceeding as "rank speculation," J. App'x at 275, may have been disingenuous, given that it promptly used them in that very proceeding as soon as it obtained them. But in the same submission to the court Nigeria explicitly reserved its right – which it indeed had under our decision in *Accent Delight* – to use the documents in *any* proceeding. Moreover, Judge Schofield never suggested that she had been misled, did not grant P&ID's request to prohibit such use of the discovered documents, and even expressly permitted such use in her ruling on JPMorgan Chase's application for a protective order. There is little in that series of events to suggest that Nigeria's statements misled Judge Schofield in any material way.

an intention to use U.S. discovery for purposes outside the contemplation of

§ 1782." *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 17. We detect no reversible

error in the first reason. Although Nigeria's discovery requests seem largely

consistent with a purpose of criminally investigating the procurement of the

Arbitration Award, the ultimate question of burdensomeness is within the

district court's discretion to decide, and not ours. The second reason is somewhat

opaque, but appears to refer to the possibility that Nigeria would use the

materials it obtained pursuant to this application in the English Proceeding. As

explained above, use in the English Proceeding is not a "purpose[] outside the

contemplation of § 1782." *Id.* If that was the purpose to which the district court

referred, it based its reasoning regarding the fourth factor at least in part on legal

error.

We therefore conclude that the district court erred in evaluating the fourth

*Intel* factor insofar as its reasoning depended on its view that the use of evidence

in the English Proceeding was a "purpose[] outside the contemplation of § 1782."

*Id.*

51

## III.    The Appropriate Remedy

Having concluded that the district court relied on erroneous legal premises in evaluating the third *Intel* factor, and to some extent in evaluating the fourth, we turn to the appropriate appellate remedy. The third *Intel* factor clearly was the driving force behind the district court's decision to vacate its earlier *ex parte* grant of the application. *See id.* at 14 ("[T]he Court agrees both that [the third] factor merits the greatest weight in the discretionary analysis here, and that it strongly counsels against authorizing U.S. discovery under § 1782."). Moreover, we see no alternative grounds upon which we could affirm the district court's judgment.[7]

---

[7] VR invites us to affirm the judgment on the alternative ground that the first *Intel* factor – whether "the person from whom discovery is sought is a participant in the foreign proceeding," *Intel*, 542 U.S. at 264 – weighs against the application. But the district court concluded that the first factor at least "nominally [] favor[ed] allowing U.S. discovery under § 1782," *Fed. Republic of Nigeria*, 499 F. Supp. 3d at 13, and VR offers no reason why we should view that conclusion as an abuse of discretion. Moreover, while Nigeria does not challenge the conclusion that the first factor only *nominally* favors the application, we have some reservation about even that conclusion. The purpose of the first factor is to root out situations in which "the need for § 1782(a) aid [] is not as apparent" because "[a] foreign tribunal has jurisdiction over" the party from whom discovery is sought "and can itself order [that party] to produce evidence." *Intel*, 542 U.S. at 264. It is true, as the district court noted, that P&ID is a party involved in the Nigerian Proceedings and is likely to possess many of the same documents as VR concerning VR's acquisition of an ownership stake in P&ID. But VR is a distinct legal personality, and it would be far from surprising if a minority shareholder of an entity under criminal investigation were more responsive to

At the same time, the district court's evaluation of the fourth *Intel* factor – which was, at most, only erroneous in part – counsels against outright reversal. As explained above, the district court evidently had some concern about the sheer breadth of Nigeria's discovery requests and their proportionality to the allegations of fraud and bribery under investigation. It is conceivable that, if the district court conducted a fuller analysis of the fourth factor, it would still conclude that Nigeria's discovery requests were sufficiently burdensome to warrant a denial, or more likely a limitation, of the application. *See Fed. Republic of Nigeria*, 499 F. Supp. 3d at 17 ("At a minimum, [] were the § 1782 subpoenas otherwise to be upheld, they would need to be carefully pruned."). We therefore conclude that it is not appropriate for us to reverse the district court's judgment outright and order the discovery that Nigeria has sought. *Cf. Intel*, 542 U.S. at 266 ("Several facets of this case remain largely unexplored . . . . On the merits, this case bears closer scrutiny than it has received to date . . . . [W]e leave it to the courts below to ensure an airing adequate to determine what, if any, assistance is appropriate.").

Rather, we believe that the appropriate remedy for the district court's

---

discovery requests than the entity itself.

abuse of discretion in this case is to vacate the district court's order and remand for further consideration. On remand, the district court should reconsider Nigeria's § 1782 application, consistent with our ruling that the application may not be considered an attempt to "circumvent" the MLAT and that Nigeria is within its rights to use any evidence it might uncover pursuant to this application in the English Proceeding.

## CONCLUSION

For the reasons stated above, the judgment of the district court is VACATED and the case is REMANDED for further consideration of Nigeria's application consistent with this Opinion.